(No. 11888.—Decree affirmed.)

ALICE C. WELLER *et al.* Appellees, *vs.* WILLIAM A. COPE-LAND *et al.* Appellants.

*Opinion filed October 21, 1918.*

1. CONTRACTS—*each party to contract must have sufficient mental ability.* To make a valid contract each party must not only be of sufficient mental ability to appreciate the effect of what he is doing but must also be able to exercise his will with reference thereto.

2. SAME—*extent to which monomania affects contract.* Monomania or delusion which is so connected with the subject matter of a contract as to render the afflicted party incapable of understanding the nature and effect of the agreement or of acting rationally in the transaction will render the contract voidable at the option of such party.

APPEAL from the Circuit Court of Livingston county; the Hon. G. W. PATTON, Judge, presiding.

B. R. THOMPSON, and H. G. GREENEBAUM, for appellants.

TUESBURG, WILSON & ARMSTRONG, for appellees.

Mr. CHIEF JUSTICE DUNCAN delivered the opinion of the court:

This appeal is prosecuted by the appellants, William A. Copeland and Ada Copeland, husband and wife, from a decree rendered August 25, 1917, in the circuit court of Livingston county, setting aside a certain contract and a

warranty deed to lot 7, block 19, Fell's First addition, and lot 4, block 2, Myers' First addition, in Pontiac, Illinois.

The bill was filed April 21, 1915, and charged, in substance, that complainant, Ann Odell, and appellant W. A. Copeland, executed said contract on January 16, 1915, and on the same day she executed a deed whereby she purported to convey to him her said two lots, improved, of the value of $5000, one of which was her home, on condition that he would maintain the property, pay off a mortgage of $900 thereon and all accrued and accruing taxes, and would support and provide for her during her life and pay the expenses of her burial. It further charged that by reason of her old age and feeble health and the impairment of her mental faculties the contract and deed were not binding on her; that the same were obtained by Copeland by undue influence; that he failed to carry out his contract with her and on demand refused to re-convey her property; that she was at all times willing to reimburse him for money expended by reason of said contract and offered to do so in her bill. Appellants filed an answer admitting the signing of the contract by W. A. Copeland, alleged the performance thereof by him and that the same was binding upon both parties thereto; denied complainant's incapacity to make the contract and denied the charges of undue influence. After the filing of the replication and the referring of the cause to the master in chancery to take proofs and report his findings some evidence was taken previous to August 3, 1915, when the complainant died, leaving her surviving appellees, Alice C. Weller and Emma S. Bradley, daughters of her deceased sister and Isaac Cook, (complainant's first husband,) James H. Cook, a brother of Alice and Emma, and Hazel Nichols, her grand-niece, as her only heirs-at-law. She left a last will and testament made by her March 24, 1915, by which she willed her property to Emma S. Bradley and Alice C. Weller and named D. S. Myers as executor. On January 10, 1916, her heirs-at-law and the executor were,

on motion, substituted as complainants in said bill and the supplement thereto, which contained the allegations necessary to their right to maintain the suit. Answer and replication were filed and the cause was again referred to the master in chancery. The master heard and reported the evidence, found the issues for appellees, and recommended a decree in their favor in accordance with the prayer of the bill. Objections were filed before the master and overruled and exceptions taken, which were overruled by the court and a decree entered in accordance with the recommendations of the master, that the contract and deed in question be canceled; that appellees re-pay to appellant W. A. Copeland $954, principal and interest, paid by him on the mortgage; that he be required to account for a reasonable rental for lot 7, aforesaid, still occupied by him, and that appellees account to him for moneys expended by reason of said contract and deed.

The court found in favor of appellants on the issue of undue influence, and based his decree upon the finding that the contract and deed were entered into as a result of Mrs. Odell's disordered and diseased condition of mind and that she was not competent, mentally, to enter into such contract. The only issue raised by the assignments of error on this appeal relates to the condition of mind of Mrs. Odell and her competency to sign the contract and deed.

The record evidence discloses that Ann Odell was seventy-six years of age at the time she signed said instruments; that in the two years or more immediately prior thereto she had had several attacks of illness and had gradually and continually grown weaker, both physically and mentally, up to the time of her death, and for a short time prior to her death was violently insane and a physical wreck. Twenty witnesses or more testified for appellants and about an equal number testified on behalf of appellees. The sum and substance of the showing made by appellants' testimony is, that while she was unable to read or write and did not

know the size and denominations of paper money, she knew coins and their value by their size and color, and was enabled to pay her daily or weekly bills and to offer the proper amounts therefor in coin and paper money after she had had the paper money so placed or arranged that she knew the size of the bills by the position in which she had had them placed by others and by her knowledge of the size of the coins; that she was able to comprehend and transact her ordinary business for the two years previous to the signing of said contract, such as the purchase and payment of fuel, oil, table supplies and other necessities, and the contracting and settling for improvements made to her house, such as additions, repairs and the installation and repairing of a heating plant. The evidence also shows that she transacted a few deals in buying and selling real estate but was assisted and advised generally by others in doing so. D. S. Myers kept her money in his possession, kept her accounts and also kept her constantly posted as to the condition thereof, which she was very prone to forget and asked to have the same often stated, on which account the bank had refused to carry · her deposit and to keep her accounts. For two years or more prior to the time in question she was very weak physically, and generally got around in the house by holding on to chairs, and was scarcely ever able to go up-town to the stores or other places where she made her purchases. For this reason she ordered nearly all her purchases through others and had the articles sent to her. She had her money sent to her by Myers in proper change and so distributed and placed that she could pay the party who delivered the articles, and occasionally she had others draw checks for her and pay for improvements and repairs on her houses. The evidence shows also that R. S. McIlduff, the attorney who drew the contract and deed at the instance of Copeland, took unusual pains to fully, explicitly and in detail read and explain the contract and deed and the meaning of each portion thereof, and that one or more of the persons who wit-

nessed the same, by their questions drew answers from her that seemed to show that she understood the force and effect of the contract and deed, as to how they affected her and as to how they would affect Copeland, and that with such knowledge she signed the same after having been advised by all of them, in the presence of Copeland, that she ought to keep her property and not deed it away.

The contentions of appellees are that Mrs. Odell was afflicted with a monomania or delusion that deprived her of the power to protect herself in this deal and impelled her to enter into the contract regardless of the consequences of her act, and that the act was not of her own free will but the result of a diseased mind, and therefore not binding upon her. The substance of their claim is that she was absolutely crazy upon the subject of marriage and was possessed of an insane desire to marry at all hazards, and possessed of the delusion that Copeland would marry her and would never marry anyone but her. We think that while it may not be technically correct to say that she was possessed of a delusion, the evidence in the record does show that she was afflicted with a monomania; that she was crazy upon the subject of marriage, and that her disease had reached the stage that when she came in contact with a man, and particularly a young man, she had a mania or belief that he would marry her and an irresistible impulse to give or bestow upon him all of her worldly possessions, and that no amount of persuasion or reason could dissuade or keep her from giving him everything she had if he would accept it, or drive her from the notion that he would marry her. Many of the witnesses for appellees, and some of the witnesses for appellants, testified that in about every conversation they had with Mrs. Odell within two years prior to the contract, and also after the contract, she persistently talked about marriage and about getting married, and talked it continually and in a very silly and many times in a very unbecoming manner. She related dreams about her marriage

and of the beautiful things she had at her wedding, the beautiful dishes on the table, the beautiful flowers and who were her bridesmaids. She expressed on many occasions to many witnesses her determination to marry a young man; that she was going to get married to a young man and did not want an old man; that she would give every dollar she had to the man that would marry her and take care of her as long as she lived. None of her friends and neighbors with whom she talked about marriage and giving up her property were able to dissuade or change her notion that she was going to marry and that her marriage was going to take place in the very near future, although she had had absolutely no assurance whatever from the parties she expected to marry that they would consider a proposition to marry her, but, on the other hand, had been assured by the parties whom she expected to marry that such a marriage was out of the question.

There is considerable evidence in the record that Mrs. Odell was afflicted with insanity during the summer previous to and after the instruments in question were signed by the parties. The pastor of her church and others testified about Mrs. Odell telling them of her communicating with spirits of the other world and advising with such spirits about her troubles. Several of the witnesses testified about her habit of talking aloud to herself when she would be in her room, alone. She spoke at times to some of the witnesses of hearing strange voices when no such sounds were made; of seeing frightful and strange sights at a park near her house, in broad daylight; of seeing girls and boys stripped and cut up with knives; of hearing their screams and smelling the blood and flesh, and on one occasion said that it would take a year for the blood to get out of the park. She also told about different women being abused and maltreated in the park by men. These were all imaginations upon her part as the result of a diseased mind, as is clearly shown by the evidence. For the past two years

previous to the signing of the contract in question she acted and dressed like a giddy young girl, frizzed her hair, wore bright colors and laces on dresses suited only to young girls, wore ribbons of all colors, such as pink, red, blue, drab and white, in her hair and tied in large bows.

D. B. McKinney was employed by Mrs. Odell in June, 1913, to repair or build an addition to her house which required about six weeks' work. His testimony is, in part, that while he was there at work she spent a great deal of her time talking to him about marriage and told him about many persons whom she could have married. She told him about meeting, while down south with Dr. Middleton and his family, an old gentleman who wanted to marry her, and told McKinney she wished she had married him. She became very desirous of marrying McKinney and sent for him a number of times after he had finished his job, upon various pretexts of doing other jobs but only for the purpose of talking with him upon the subject of marriage. She proposed giving him everything she had if he would take her and care for her, and she annoyed him a great deal about marrying her. On one occasion she sat down beside him, took hold of his hand and slipped a ring on his finger, all the time talking about marriage. She proposed to him to sell her property on North street, and told him that if he could sell it for her she would buy an automobile and get somebody to run it and that she and he could ride in it. He further stated that when she would be talking on the subject of marriage to him she would keep getting closer to him and acted like she was going to lay hold of him. On two occasions when she saw him with another woman she became very angry at and abusive toward him, and would talk very loud and abusively to him, regardless of parties who would be standing near and hearing her. After Copeland had married, on March 15, 1915, when informed of his marriage she trembled violently and said, "Billy is married!" She was abusive toward Copeland, both before and

after his marriage, in the same way she had been to Mc-
Kinney, and whenever he indicated that he was going to
marry another woman she tried to prevent the marriage by
pleading with him and telling slanderous stories about the
woman. After Copeland married she asked one of appel-
lees to send for McKinney "to see if she couldn't forget
Billy," referring to Copeland. When McKinney came she
told him she was going to build a cottage and give it to him.
After signifying his intention of going home from that visit,
she told him she would get down on her knees to him if
it would do any good, and told one of appellees she wanted
to kiss him good night. McKinney was shown to have been
a stranger to her when he first went to work for her, and
never gave her any encouragement or did anything that
would lead a rational person to believe that he would en-
tertain the idea of marrying her, but his conduct was quite
to the contrary. Notwithstanding this she had the idea that
she was going to marry him and talked about it many times
to other persons, and gave to one of the witnesses as her
reason why she did not marry him, that she wanted to buy
a white dress as her wedding dress; that she had the table
all set beautifully, but that Hattie (Mrs. Healess) didn't
get the dress made, and that that was the reason the wed-
ding fell through.

Dr. A. D. Middleton, who had treated Mrs. Odell for
eye-trouble several times, and as late as March, 1914, and
with whom she had made the trip down south and return
in the winter and spring of 1913, gave it as his judgment
that she was capable of transacting ordinary business. He
was, however, interrogated no further, and strongly cor-
roborated the testimony of appellees' witnesses by testifying
that she said on a number of occasions after returning from
Florida, "probably jokingly," that she had a chance to marry
a wealthy man down there.

Copeland's experience with Mrs. Odell and her conduct
with him and talks about him were very similar to the ex-

perience of McKinney with her. Copeland was an automobile salesman and a machinist and was worth $10,000 or $12,000 when his testimony was given. He had lived in Pontiac since March, 1901, and was thirty-six years of age. His testimony shows that he was practically a stranger to her until the middle of October, 1914. He had never spoken to her except merely to greet her in passing, up to that time. In passing to and from his shop it was his custom to pass her house. By his own testimony, about the middle of October, 1914, she began stopping him when passing her house. At first she wanted to rent him some rooms, and on declining that proposition she offered to rent him two other rooms that were then occupied by tenants who were paying the same rent for which she offered them to him. On declining these offers she afterwards repeatedly, from about the first of November, 1914, until the contract in question was signed, stopped him and entreated him to let her deed her property to him, he to pay off the mortgage of $900 and care for and maintain her. She became so annoying to him that he changed his route and would not pass her house on his way to his work, according to his testimony. After that, the postman testified that she continually begged him to see Copeland for her and ask him to come down and see her, and after repeatedly telling Copeland of her request the postman finally told him to go down and settle the matter, whatever it was, so she would not further annoy him. She also continually called Copeland over the telephone at his shop, and addressed him as "Billy," and begged him to come down and see her. He finally went down to see her and agreed to consider her proposition, which he had already repeatedly turned down, that she would deed him the property if he would pay the mortgage off and care for her as long as she lived, after she had further told him she would make a will and leave him all her other property. The testimony further shows that Copeland had offered before this to have the mortgage trans-

ferred to him and to carry it for her as his mortgage, and that one of appellees, her step-daughter, had offered to pay off this mortgage so that she would not be further bothered about it, but that she had declined both propositions. Copeland testified positively that he did not at any time tell Mrs. Odell he would marry her, or that he would not at any time bring a housekeeper to the house who would be over her, or that he would never marry any woman other than Mrs. Odell. He does admit in his testimony that before the instruments were signed she did talk to him about marriage; that she asked him who his girl was, and that after the instruments were signed she requested him to give up the girl and to promise her that he would do so. According to the testimony of two of the appellees Copeland told them that Mrs. Odell did ask him to marry her, and that he told her it was out of the question, as he was only thirty-four years and she seventy-six years old. He also admits that he accepted a tie pin from her as a Christmas present before the contract and deed in question were signed, and that he bought flowers for her, and two bottles of grape juice when she requested him to furnish her some intoxicating liquors, and that he took her up-town twice for a ride in his automobile.

We think it clearly appears from Copeland's testimony that he had ample evidence before the contract was signed to convince a reasonable man that Mrs. Odell was crazy upon the subject of marriage; that it was her insane notion that he would marry her and that he would do so if she deeded him the property, and that that was the real moving cause of her entering into the contract. While that is not now one of the issues in this case, a finding could well have been made, and would have been supported by the evidence, that the contract in question was the result of Copeland's undue influence on Mrs. Odell and of her unsoundness of mind. Mrs. Odell's testimony clearly showed that she was an irresponsible and crazy old woman when she

entered into the contract,—crazy upon the subject of marriage; that she was impelled to make the contract by her crazy notion that Copeland was going to marry her, and that marriage with him would be the result of entering into the contract in question. The quoting of just a portion of her testimony is convincing on this proposition, viz.: "Mr. Copeland told me time and again that he would marry no other woman and that he never would marry. He said that he thought more of me than any woman living. Then he made the biggest fuss that anybody could make. I didn't want it done right then. I wanted a man to come in daytime. I cannot read or write. I could prove it by this court house if it could speak." In speaking about the pin that she gave him Christmas, 1914, she said in her testimony: "We were sitting there and I picked up a box that I had it in and I opened it, and he says to me, 'Whose is that?' I says, 'A friend of mine.' He reached for it and wanted to take hold of it and I took and let him have hold of it, and he opened it and says, 'That is mine.' Says I, 'No, it aint.' I says, 'Wait until I tell you whose it is and you won't think it is yours.' He says, 'It is; give it to me; it is the prettiest thing I ever seen.' 'Yes,' I says, 'under agreement I will give you the pin; and another thing, you sign and swear solemnly to me that you have no other girl in Pontiac or anywhere else to look after.' He says, 'I haven't got any girl nor I never expect to have; I aint a married man nor ever expect to marry one.' It was a chip diamond. It is in Myers' bank to-day. I got it for him; I don't deny it." After Copeland gave her the flowers she was asked by Mrs. Bradley where she got them, and she replied: "Billy bought me them; Billy wants me to build a bay-window, and he will keep it filled with flowers so I can sit in it and watch him going to and from his meals."

During the time Mrs. Odell was beseeching Copeland and begging him to take her property, as aforesaid, no amount of persuasion or reasoning by her friends could

convince her of the fact that she was doing an unwise and unbusinesslike transaction in giving her property to him. They were equally helpless to convince her that it was out of all reason for her to think that Copeland would ever marry her. She talked about him continually to almost everybody that talked to her. She referred to him as her "Billy," and as her new beau, and insisted they were going to get married. If it be true, as Copeland testified, that he absolutely gave her no encouragement whatever in the belief that he and she were going to marry, this does not tend in any way to show that she was not of unsound mind or incompetent to transact the business in question but rather tends to support the position of appellees.

There are several other questions referred to in the argument of appellants supposed to have some material bearing upon the case, viz., that she made a will in March, 1915, and appellees introduced the record of probate of that will, which contained some proof of its probate; that this suit was begun and prosecuted up to the time of the death of Mrs. Odell in her own name and not in the name of her next friend or conservator, etc. The question whether or not Mrs. Odell was competent to transact ordinary business or to make a will when the subject of marriage did not enter as a consideration is not really the question in this case and does not seriously affect the question involved. The purpose of introducing the will, as we apprehend, was merely to show who were the devisees and legatees and who was the executor, and to merely prove the fact that the will was probated and the executor appointed, and to establish who were proper parties to the suit after her death. The fact is clear that none of the appellees relied upon the will as being a valid instrument, as the legatees and devisees entered into an agreement with the other heirs to disregard the will and to share the property as if no will were in existence. While it is the usual and proper practice to bring suit in the name of the conservator, if there is one, or in

the name of a next friend if there is no conservator, no such question was raised at any time during the pendency of the suit brought in Mrs. Odell's name, and if there had been, the error could have been easily obviated by a motion upon the part of her counsel to amend the bill so as to make it read as brought by Mrs. Odell by her next friend. No such a necessity now exists under any view of the case, as the supplemental bill is prosecuted in the name of her heirs and executor, the only proper parties to the suit, inasmuch as the four heirs also include all the legatees or devisees in the will.

For the reasons aforesaid our conclusion is that the decree of the chancellor in this case is amply supported by the evidence and that it should be affirmed. While it is the rule that a monomania or delusion unconnected with the subject matter of the contract does not destroy its binding force, still, if the monomania or delusion is so connected with the subject matter of the agreement as to render one of the parties thereto incapable of understanding the nature or effect of the contract or of acting rationally in the transaction, it is thereby rendered voidable at the option of the party so afflicted. To make a valid contract, each party entering into it must not only be of sufficient ability, mentally, to appreciate the effect of what he is doing, but must also be able to exercise his will with reference thereto. (1 Elliott on Contracts, secs. 365, 366, and authorities cited.) The evidence in this case shows that Mrs. Odell was not capable of exercising her will in this transaction, even if she was able to comprehend the meaning and effect of the provisions of the contract.

The decree of the circuit court is therefore affirmed.

*Decree affirmed.*