No. 12,824.

Ellis *v.* Colorado National Bank et al.

(10 P. [2d] 336)

Decided April 4, 1932.

Messrs. Melville, Melville & Temple, Mr. Gilbert A. Walker, for plaintiff in error.

Messrs. Bartels & Blood, Messrs. Gooding & Monson, for defendants in error.

*En Banc.*

Mr. Justice Hilliard delivered the opinion of the court.

November 6, 1922, Ivy May Ellis, plaintiff's wife, made her will, devising and bequeathing her entire estate

in trust, the income therefrom to be paid one-half to her husband and one-half to their three minor daughters, who are among the defendants here; William A. McKinlay, a brother-in-law of Mrs. Ellis, and the Colorado National Bank were named executors and testamentary trustees; October 9, 1923, Mrs. Ellis died; November 2, 1923, her will was presented for probate and November 20, 1923, it was duly admitted and the executors qualified; December 8, 1924, the estate was closed, the executors discharged, and the assets taken over by them as testamentary trustees; March 30, 1925, William A. McKinlay died, and since the bank has been sole trustee; October, 1926, the plaintiff remarried; and March 24, 1927, this action was begun. It has been before us twice on procedural questions. *Ellis v. Bank,* 84 Colo. 266, 269 Pac. 997; *Ellis v. Bank,* 86 Colo. 391, 282 Pac. 255. On the first occasion we determined that plaintiff had pleaded but one cause of action in his complaint and held that the sum of the allegations was that ''through conspiracy, and actual or constructive fraud,'' the defendants had despoiled the plaintiff, while insane, of his property. In exposition of this view, Mr. Justice Burke, speaking for the court, analyzed the complaint, and such analysis became fair notice not only as to what defendants would be expected to meet, but of the proof that would be required on plaintiff's part. Defendants made denial and the matter came on for trial. At the close of plaintiff's case in chief defendants moved to dismiss, or for a nonsuit, on the ground, generally, that plaintiff had failed to prove the material allegations of his complaint. The motion was granted and judgment given against plaintiff.

For understanding of the complaint we quote from *Ellis v. Bank,* 84 Colo. 266, 271: ''Mrs. Ellis illegally took over the property and business of her insane husband; Mr. McKinlay was a party to that wrong and guided her to Bancroft who, acting for the bank, drew a will disposing of it; Mr. McKinlay and the bank became and acted as executors and trustees under that testa-

ment; Bancroft and Maude Keller witnessed the will and helped secure its probate; that probate was procured and the estate settled and disposed of by all these people without notice to plaintiff and without his consent or appearance; the bank and McKinlay paid $2,900 out of that estate, of which amount $2,000 was divided equally between themselves; Mrs. McKinlay took and still holds her husband's share of the last named amount; Mr. McKinlay and the bank, for a mere nominal consideration, conveyed one of the plaintiff's ranches to Maude Keller who still holds it; Mr. McKinlay procured from plaintiff the deed to the Steamboat Springs home which the grantee still holds and Mrs. McKinlay and Maude Keller moved into the home, took charge of it and the minors, and ousted plaintiff. All these acts were done by all these persons with full knowledge of plaintiff's insanity, of the method by which his property was taken from him, of its disposition by will as the property of another, and its distribution through an illegal probate and settlement; and each act was done by each with the consent of the others and with their assistance, so far as the same was necessary to consummate it.''

These are serious allegations. They charge the several defendants, either to have actively cooperated in an original scheme to defraud an insane man of his property, or with guilty knowledge of what had gone before, and in furtherance of their evil purpose, to have contributed thereto, and together effected its consummation. When the case came on to be tried the trial court, on consideration of the evidence, concluded that the allegations of the complaint had not been proved. We have examined the record and can not doubt the soundness of that conclusion.

There is no evidence that at the time Bancroft drew Mrs. Ellis' will he had been told, otherwise knew or should have suspected she was not the owner of all the estate of which she was desirous of making testamentary disposition, if indeed she was not such owner. It does

not appear that Mrs. Ellis told him the source of her titles, and we know of no rule making it incumbent on one who drafts a will in such circumstances to make inquiry concerning the prospective testatrix's ownership. Nor is there evidence as to any knowledge on Bancroft's part that Ellis was not mentally sound. The evidence is undisputed that Bancroft had never known or heard of Mrs. Ellis until he drew her will, and it does not appear that he ever saw or had communication with her after he drew the will. The first time he saw Ellis was when he went to Steamboat Springs to present Mrs. Ellis' will for probate and he testified that he regarded him then and thereafter as mentally responsible. It does appear that pursuant to Mrs. Ellis' directions, which included naming McKinlay and the Colorado National Bank as executors and testamentary trustees, Bancroft drew the will mentioned in the record, was one of three witnesses to its execution and so testified. His conduct as attorney for the estate proceeded in course and his acts, and those of the executors as well, met with the approval of the county court. The formal closing of the estate proper and the turning over of the assets to the testamentary trustees and the redocketing thereof as a trust estate, were also approved by that court. The basis of the claim against the bank is grounded solely on what it was alleged Bancroft, then and now its trust officer, knew or had done. It is clear from the record that Bancroft had no part in, or knowledge of, any wrongdoing in the premises, if any there was, nor had the bank, through Bancroft or otherwise.

The record does not show that McKinlay had anything whatever to do with plaintiff's property or affairs, before, during or after the time of plaintiff's illness, or that he conducted Mrs. Ellis to Bancroft's office, advised her to go or had knowledge of the fact that she did go. He was named in Mrs. Ellis' will as one of the executors and testamentary trustees and acted as such until his death, and as one of the executors had part in expending for

Mrs. Ellis' estate the sum mentioned in the complaint, $2,900, $900 of which was for inheritance tax and other usual cost items, and $2,000 as executors' fees, one-half of which he received. All of these expenditures had the approval of the probate court. It does not appear that in reference to anything in the premises there was concert of action on the part of McKinlay and Bancroft except in orderly probate court proceedings, of which, as such, no criticism is suggested as to a single item.

There is no showing that McKinlay procured from plaintiff a conveyance of the so-called Steamboat Springs property. A deed was given by plaintiff to the bank and McKinlay, as trustees of Mrs. Ellis' estate, but why he executed it rests in surmise. The transfer simply increased the trust estate to the extent of the property conveyed, the use and income of which plaintiff and his children shared. Whatever may be thought of the mental condition of Ellis at any time, this particular act could well have been the conception of a sane and elderly man, having concern for the ultimate welfare of his children. Bancroft's only information on the subject arose from the receipt of the deed by mail, and his only act in relation to the matter was to have it recorded. There is neither allegation nor testimony that any of the other defendants had part in it. None stood in position to profit by it.

It was not shown that Mrs. McKinlay ever had her husband's share of the executors' fees allowed by the court, or any part of it, or that her husband left an estate out of which she did or could realize such or any sum.

The claim that after Ellis had conveyed the Steamboat Springs property to the trustees, Mrs. McKinlay and Maud Keller ousted the plaintiff therefrom is without support. On the contrary it appears that after Mrs. Ellis' death McKinlay and his wife and Miss Keller, the women being sisters of the deceased, not after, but before the execution of the deed, did move into the premises and there cared for the three motherless Ellis children, and

they and Ellis and his children all lived there together. There is nothing to indicate that the arrangement was not mutually agreeable, and it only ceased to be the abiding place of all of them when plaintiff remarried and voluntarily left. It does not appear that defendants have alienated the affections of plaintiff's children, or that they are not in fact desirous of having friendly relations with their father.

The proceedings for admission of Mrs. Ellis' will to probate occurred in Routt county court, not without notice to Ellis, as alleged, but after legal service of a statutory citation by the sheriff on him and all others in interest. The testimony of the witnesses to the will was taken in his presence, and before the will was admitted, also done in his presence, the judge of the court inquired of the plaintiff as to whether he was satisfied with its provisions, to which he made an affirmative answer. In addition his formal written consent to the probate is likewise on file. We have not failed to note counsel's statement, made at the trial, that the county judge then knew Ellis was of unsound mind, but there is no evidence to that effect. Hon. Charles A. Morning was, at the time of the hearing on the will, and for some twenty years had been, judge of the court. The court below did not, and we can not, attribute any such knowledge to this sworn official. This court may not translate statements of counsel at nisi or in briefs here, into evidence.

It does not appear that the trustees, McKinlay and the bank, conveyed any of plaintiff's property to Maud Keller, for a trifling consideration, or at all, although there is solemn averment to that effect. All that appears from the testimony is simply stated. At the time of Mrs. Ellis' death one Larson owed her a balance of $5,000 on a note secured by a trust deed on land. Larson was unable to pay, but was willing to convey his equity rather than put the estate to the expense and delay of formal foreclosure. In the interest of economy, and that it might facilitate conveyance should there be opportunity

to realize their claim by such means, the trustees resorted to the not unusual method of having title conveyed to a third party, subject to the encumbrance. Miss Keller was chosen for this role, accepted the conveyance from Larson and quitclaimed to the trust estate. She was, so to speak, an accommodation holder of the title and at no time had or claimed any beneficial interest in the property.

It is alleged that plaintiff was owner of several pieces of real property, described at length in the complaint, which Mrs. Ellis, aided by McKinlay, her brother-in-law, unlawfully, without consideration, and in fraud of her husband's rights, caused him to transfer to her. Let the items be referred to as parcels 1, 2, 3, 4, 5, 6, 7 and 8, and the record speak as to the facts.

Parcels 1 and 2. These comprise the Steamboat Springs home and lots, conveyed to the trust estate by the plaintiff. This conveyance was made long after Mrs. Ellis' death, and has been explained earlier in this opinion.

Parcels 3 and 4. These were state lands sold January 5, 1910, on certificates issued to a corporation; May 22, 1911, the corporation assigned the certificates of purchase to the plaintiff, who, November 25, 1919, assigned them to Mrs. Ellis, who thereafter made the payments thereon, and to whom patents subsequently issued. These patented lands became a part of Mrs. Ellis' estate. On objection evidence as to these parcels was held to be at variance with the allegations, but leave granted to plaintiff to amend was not availed of.

Parcel 5. This was conveyed to one Tyson by plaintiff in 1904, and in 1915 Tyson conveyed to Mrs. Ellis. In 1919 Mrs. Ellis conveyed to one Larson, taking back a trust deed securing a note for $6,000 as part of the purchase price. This note, less a credit of $1,000, became a part of the assets of her estate. Subject to the $5,000, Larson conveyed to Maud Keller who deeded to the trust estate as is set forth above.

Parcels 6 and 8. March 3, 1916, Ellis, his wife joining,

conveyed a one-half interest to Sherman Cox; November 14, 1917, Ellis, his wife joining again, and Cox, conveyed all to James L. Norville.

Parcel 7. March 3, 1916, Ellis, Mrs. Ellis joining, conveyed a one-half interest to Cox; March 21, 1916, Ellis (Mrs. Ellis not joining) and Cox conveyed to Frank Groh.

There is no evidence tending to connect McKinlay with those transactions, or that Mrs. Ellis influenced the sales or received any part of the consideration. Only one of these grantees, Norville, was called by the plaintiff to testify. He said he had known the plaintiff thirty-five or forty years, but we regard as significant, as the trial court may have, the fact that he was not asked whether Mrs. Ellis was instrumental in negotiating the sale, to whom the consideration was paid, or regarding Ellis' mental state.

There is no evidence that at the time Ellis became ill in 1914 he had cash in hand or money in bank, or that if he had Mrs. Ellis took possession of it. About his cattle, and no doubt many cattle were accredited to his ownership at such time, the only definite evidence as to the identity of any is by way of various chattel mortgages which he had given. Not a witness testified as to what had become of the cattle, or whether they were sold for more than the mortgages, or, if sold for more, who transacted the business and received the net avails. The chattel mortgages were mainly held by cattle loaning companies and banks, the representatives of which, it would seem, could have been called to make clear that which is left in mystery. At least two of the witnesses called by plaintiff and who were working for him at the time he became ill, testified that after plaintiff's breakdown they worked for the mortgagees. In any event there is no testimony that Mrs. Ellis sold the cattle or received the proceeds.

There is no evidence from which it could be determined that Mrs. Ellis did not own all the property scheduled in the inventory of her estate. On the contrary there is in the record basis for the belief that she did own it. From

her father's estate and her own independent efforts she owned and possessed real and personal property when she married Ellis, into the enjoyment and management of which he immediately entered. Their relations were apparently of the happiest. Children were born to them. He was alert, industrious and resourceful; she confiding, trustful and loyal. More and more he became dominant in controlling the property and more and more her identity became absorbed or lost in his name and fame in which both she and their children grew to have pride. Each contributed a full measure of service and both wrought to the same end, their own and their children's comfort and happiness. As between themselves it did not appear to matter which owned whatever they possessed, and each had title to lands. By general usage, however, it would seem that in the course of the years the personal property became regarded as belonging to the husband, not that he assumed ownership in denial of his wife's rights, or that in legal contemplation she yielded such ownership, but simply as the result of the harmonious relations which obtained between them. But suddenly he who had been as the mighty oak was felled, and she who had grown to be as the vine found herself the stronger of the twain. Lacking neither courage nor ability the wife again assumed the responsibility of which her husband in his strength had relieved her, and for ten years immediately preceding her death she carried on. A fair deduction from the whole record is that the fact of Mrs. Ellis' ownership is consistent with her apparent ownership of the property she possessed at her death.

Mrs. Ellis and her family lived largely apart from her relatives, and nowhere in the record is there aught to indicate that she had concern other than for her invalid husband and children. Not a relative of hers, defendant, or other, or any stranger, defendant, or not, is shown to have been allowed through this wife and mother to have the least item that was of value to her immediate household; and in her will neither relative nor stranger received leg-

acy or devise. In life she apparently lived only for her husband and children, and in contemplation of death she made provision only for them. Yet, notwithstanding that everything disclosed by the record redounds to this woman's credit, some four years after her demise she is accused of conspiring to defraud her husband, and through the aid of others, accomplishing such result. There is no evidence in substantiation of the accusations, and it is interesting to note that Mr. Ellis neither subscribed to the charges nor essayed to give testimony against the deceased mother of his children. A stranger qualified for this calumny. Perhaps it is significant in such connection that in the conception of this stranger the matter has been so presented that for the purpose of gaining the estate Mr. Ellis may be adjudged to have been mentally incompetent as of a chosen time, and for the purpose of the possession of the estate his mental faculties, are restored as of another chosen time. The potential wisdom of the trust arrangement which Mrs. Ellis made for her husband may be said to increase with time and study.

Since the charge of conspiracy is without evidentiary support there is not particular need that we discuss the allegations concerning the mental capacity of Mr. Ellis. But perhaps the opinion would appear incomplete were all reference to that subject omitted. Prior to January, 1914, Mr. Ellis was evidently physically robust and mentally keen. At that time he was suddenly stricken and for a period his recovery was doubtful. After a few months he was able to return to his home and family, but not then nor since has he enjoyed his former strength of body or mental alertness. For instance, to emphasize what we have already said, he has not since felt equal to engaging actively in the ranch and cattle business, or other occupation involving prolonged and sustained physical and mental effort. It was the trial court's conclusion, however, and such view has our concurrence, that the evidence does not show that Mr. Ellis was insane in the sense that he was incapable of understanding and ap-

preciating the extent and effect of business transactions in which he engaged. And that seems to be the test. *Green v. Hulse,* 57 Colo. 238, 142 Pac. 416. He has not at any time been adjudged insane, nor has a charge of that nature been lodged against him. His counsel said in a brief filed in a former review that "this plaintiff is not insane," and here, again referring to the matter, they use the following language: "In order that we may not be misunderstood we said then and we say now that plaintiff at the time of filing this complaint or at the time of the trial or at this time is not *insane,* as that word is construed by the Colorado Statute, and no lunacy commission could or would so hold."

Many of the witnesses, all called in plaintiff's behalf, testified to the effect that Mr. Ellis was capable of understanding business transactions and could comprehend the nature and effect of conveyances. The evidence generally shows that during the time when it is claimed he was insane, Norville, Cox and Groh were buying his lands and accepting without question his deeds therefor; that Long, his next friend here, and principal witness as to Ellis' lack of mental capacity, testified nevertheless that he was employed by Ellis, not Mrs. Ellis; that the judge of his home county received his written waiver and oral announcement in open court to the effect that the provisions of his wife's will were satisfactory to him, and that based thereon and the usual formal testimony admitted said will to probate and record; that he conferred frequently with Bancroft in relation to the estate and advised about it, and with apparent understanding, and applied for and received regularly his share of the income arising from the estate and according to the terms of the will; that he sat in family conference, Mr. Bancroft also attending, on the matter of allowing one of the daughters extra money from the estate for additional educational advantages, and that his adverse decision operated to prevent such expenditure; that he made a contract to employ counsel in this matter, afterward discharged him,

and still later employed him again; that he entered into a new marriage contract and established another home. In short Mr. Ellis did anything and everything sane men do, and as far as the record indicates in precisely the same manner.; and a remarkable part of the story is that he seems to have acted with not a little wisdom. Perhaps engaging in this litigation was his major error, while the acceptance of the provisions of his wife's will may well be thought to have been the best of good judgment.

As of very right, the record considered, the defendants should stand absolved of any sort of wrong in this case, and since that was the effect of the judgment below it is affirmed. And we feel constrained to say further that in our view such judgment does not work a disservice to the plaintiff.

Judgment affirmed.

MR. JUSTICE BURKE dissents.

MR. JUSTICE MOORE not participating.