No. 15,464.

HANKS, CONSERVATOR *v.* McNEIL COAL
CORPORATION ET AL.
(168 P. [2d] 256)

Decided April 8, 1946.

Messrs. IRWIN & O'CONNELL, for plaintiff in error.

Mr. STANLEY T. WALLBANK, for defendants in error.

*En Banc.*

MR. JUSTICE STONE delivered the opinion of the court.

LEE A. HANKS, who was a prosperous farmer and business man in Nebraska, came to Colorado with his family in 1918, at first settling on a farm in Weld county, which included the coal lands involved in this proceeding; then, in 1920 moving to Boulder where he purchased a home, engaged in the retail coal business, and thereafter resided. His son, J. L. Hanks, continued to operate and live on the farm as a tenant. From 1932 to 1934 the father also owned a coal business at Sterling, Colorado, but the manager was not satisfactory

and he disposed of it at a loss. A considerable part of the time he further engaged in the business of buying, feeding and selling livestock, in which his son was associated with him. Shortly after 1922 Lee Hanks discovered that he was afflicted with diabetes, and members of his family noticed a progressive change in his physical and mental condition thereafter. He became irritable and easily upset, very critical of his son's work, and increasingly interested in the emotional type of religion. He began to speculate in oil and other doubtful ventures with money needed for payment of debts and taxes. About 1934 he sent his son what he denominated a secret formula for the manufacture of medicine to cure fistula in horses, which was compounded principally of ground china, brick dust, burnt shoe leather and amber-colored glass. If the infection was in the horse's right shoulder, the mixture was to be poured in the animal's left ear, and if on the left shoulder then in the right ear. In 1937 Mr. Hanks started to advertise this medicine through the press under the name of Crown King Remedy. Thereafter he increasingly devoted his efforts and money to the compounding and attempted sale of this concoction, his business judgment became poor and he finally deteriorated mentally to the point that on May 25, 1940, he was adjudicated insane and his son was appointed conservator of his estate.

As to the coal lands here concerned, the evidence shows that Hanks in 1930 executed a twenty-year lease of the quarter section to the defendant coal company for coal mining purposes at ten cents per ton royalty, with a minimum royalty of $2,000 per year, but the son continued to farm the surface. Under this lease the coal mined was as follows: 1930, 2909.30 tons; 1931, 27,806.70 tons; 1932, 59,192.70 tons; 1933, 69,030.10 tons; 1934, 87,661.40 tons; 1935, 80,890 tons; 1936, 76,522.20 tons; 1937, 34,226.76 tons; 1938, 18,268.16 tons. No coal was mined from the Hanks land after 1938, and the total of royalty payments to the date of his deed was $43,158.32.

About 1931 Hanks mortgaged this property and thereafter defaulted in payment so that foreclosure proceedings were instituted, as a result of which a decree of foreclosure was entered and the property went to foreclosure sale. Hanks failed to raise sufficient money to make payment during the period of redemption and, in order to save the property from going to deed under foreclosure, in the fall of 1934 he finally executed two mortgages to his judgment creditors, Collins and De-Bacher, totaling $30,000, the first mortgage for $16,708.62 representing the amount actually due and owing, and a second mortgage for $13,291.38 representing no indebtedness, but a bonus which he was required by his mortgagees to pay for redemption from the foreclosure and extension of the loan. The second mortgage note was payable ten years after date without interest. As further security, Hanks executed to these mortgage creditors an assignment whereunder a portion of the royalties received under his coal-mining lease was required to be paid toward the liquidation of the debt.

At about that time Hanks learned that the defendant coal company, which had leased other lands lying to the north of his property, was extracting coal from their other leased lands and conveying it by means of the open haulage way through his lands to its shaft located to the south thereof. Hanks made demand for payment of royalty on the coal so transported across his land and there was extended argument and controversy which finally led to discussion of outright purchase of the Hanks property and the ultimate signing of the contract here involved on July 21, 1937, between Hanks and the defendant companies, whereby he contracted to sell said quarter section of land with all water and mineral rights, subject to the aforementioned mortgages, and further to release all claim for haulage of coal through his said lands, in consideration of the payment to him of $5,000 in cash and the execution back of a farm lease upon the surface and water for five years, Hanks as

lessee to pay all water charges and taxes, except taxes on coal, during the term of the lease. The present action was brought by the conservator seeking to have the court set aside this contract, and the deed and surface lease executed pursuant thereto. The record is voluminous; the case was carefully considered by the court below and judgment of dismissal entered on findings against plaintiff both on the question of insanity and that of inadequacy of consideration, coupled with unfair advantage and weakness of mind.

It is first urged that the trial court was not supported by the evidence and proper conception of the applicable law in finding Lee Hanks not legally insane at the time of his sale to defendants in 1937. At the time of the insanity adjudication in 1940, he was found to be suffering from senile dementia, paranoia type, a condition that does not come on suddenly, but progresses over a period of years. He was then hallucinating and subject to insane delusions. A psychiatrist testified in substance that there were certain mental changes starting as early as 1930 that continued to increase in intensity and culminated in 1940; that it was difficult to state specifically when his incompetency began; that, as appeared from the testimony and exhibits in the case and from his examination and observation at the psychopathic hospital, it seemed to the witness that Hanks "might well be considered without full possession of his faculties to attend to his property adequately" at the time of the sale of his property to defendants in July 1937, and that it was his opinion that Lee Hanks was incompetent in 1937.

Hanks' son, who was in the best position to judge of the business competence of his father, testified: "Q. Now, my question is, when did you first believe your father was incompetent to look after his business affairs? A. I didn't realize the full extent, the manner he was imposed upon, until after I had the complete files and the complete information. * * * My mind was not totally made up until after he was made incompe-

tent in 1940. I suspicioned that he was doing some very foolish deals all those years from time to time, and it was the summation, the total of everything that finally convinced me. * * * I want the Court to understand that I suspicioned that father needed counsel and aid to handle his business during the years mentioned, and that I did not make up my mind until I had full information of his business dealings, and that was after I was made conservator after father was sent to the hospital." During all those years the son had intimate business transactions with his father; he leased his farm property on a crop basis; engaged jointly with him in the purchase, feeding and sale of cattle; worked with him in procuring loans; was aware of his efforts to refinance after foreclosure and of his giving the bonus mortgage. The father's attorney conferred with him several times during the negotiations with reference to the sale of the property here sought to be set aside, and testified that he was fully informed of the proposals between his father and the company upon which they dealt.

A Denver banker testified to the making of a substantial loan to Hanks in the fall of 1936 and again in 1939 to finance the purchase of feeder cattle, after personal interview with, and negotiation by, Hanks himself, and that he appeared to have very clearly in mind what he wanted to do in the way of feeding cattle, the kind he wanted, and the amount of feed he had on hand. The president of a Boulder real estate and loan company, who had known Hanks fifteen years, testified to making him a mortgage loan in November 1938 and meeting him a number of times thereafter and that he appeared to be rational. Four attorneys who had various dealings with Hanks testified as to his apparent grasp of business affairs and rational conduct during and subsequent to the time of the sale to defendants. A representative of the coal company from which he bought fuel, the barber whose shop was next door to Hanks' office, neighbors and customers, testified as to his doing peculiar things,

but appearing rational in his conversation and dealings, until shortly before his adjudication as insane. His attorney testified that in making the contract here sought to be set aside Hanks had extended negotiations and compelled the coal company to increase its offer in a substantial amount before acceptance.

There is always in civil, as well as in criminal, actions a presumption of sanity. *North American Co. v. Cavaleri,* 98 Colo. 565, 58 P. (2d) 756. Insanity and incompetence are words of vague and varying import. Often the definition of the psychiatrist is at variance with that of the law. The legal test of Hanks' insanity is whether "he was incapable of understanding and appreciating the extent and effect of business transactions in which he engaged." *Ellis v. Colorado Nat. Bank,* 90 Colo. 489, 10 P. (2d) 336. The legal rule·does not recognize degrees of insanity. It does not presume to make a distinction between much and little intellect. *Fleming v. Consolidated Motor Sales Co.,* 74 Mont. 245, 240 Pac. 376. One may háve insane delusions regarding some matters and be insane on some subjects, yet capable of transacting business concerning matters wherein such subjects are not concerned, and such insanity does not make one incompetent to contract unless the subject matter of the contract is so connected with an insane delusion as to render the afflicted party incapable of understanding the nature and effect of the agreement or of acting rationally in the transaction. *Weller v. Copeland,* 285 Ill. 150, 120 N.E. 578.

Contractual capacity and testamentary capacity are the same. Clearly manifested symptoms of senile dementia before a will was made, continuing until the extreme degree of dementia was reached a few months later, is held not conclusive of incapacity to make a will. *Wisner v. Chandler,* 95 Kan. 36, 147 Pac. 849; *Kaleb v. Modern Woodmen of America,* 51 Wyo. 116, 64 P. (2d) 605; nor are senile dementia and improvident expendi-

tures conclusive of lack of capacity to contract. *Gosnell v. Lloyd,* 215 Cal. 244, 10 P. (2d) 45.

Patently Hanks was suffering from insane delusion in 1937 with reference to the efficacy of the horse medicine, but there is no evidence of delusions or hallucinations in connection with this transaction or with his transaction of much of his other business at that time; there is no basis for holding voidable his sale here involved on the ground of his insanity, and the trial court correctly so held.

■ It is further urged that the sale was voidable on the grounds of sharp practice and misrepresentations employed in dealing with Hanks, the inadequacy of the consideration, and Hanks' mental weakness. Even though a mental condition may not amount to legal insanity, it may be sufficient to result in an inequality between the parties properly to be considered in connection with circumstances of unfair dealing and inadequacy of the consideration in determining whether a transaction was vitiated by fraud, either actual or constructive.

■ Much emphasis is placed by plaintiff in error on the assertedly untrue representations made by the defendant coal corporation through its president and attorney to Hanks and his attorney to bring pressure upon Hanks in connection with the sale. They were told that the quality of the coal that could be secured from his property was disappointingly poor, and that impurities and intrusions of rock occurred, greatly reducing the height of the coal and affecting its marketability, although no evidence was produced at the trial to support such contention. They were told that a new engineer's report on the property indicated that there were only approximately 155,000 tons of extractable coal remaining in this property instead of some 600,000 tons as formerly estimated by mining engineers, although at the trial, the engineer was not produced, and no adequate proof made of such survey or report. The burden of

proof was on plaintiff, not defendants, to establish the falsity of such representations made, and no such proof was offered.

Hanks and his attorney were further told that the company's president and attorney had made an exhaustive study of the question of legal obligation to pay haulage on coal transported over the haulage way through Hanks' land and that there was no legal obligation to make any payment, although at the trial the general manager of the company admitted that there was never any question in his mind, nor in the mind of anybody connected with the company, that they should not pay on a reasonable basis for haulage through Hanks' land. They were told that in order to get adequate production it was necessary for the company to procure and develop other coal lands either to the north of Hanks' property, which would require transporting the coal through his land, or to the south where that would not be required, and that unless Hanks would agree to permit haulage of coal from the north through his land for a small nominal lump sum, the company would cease its development to the north and would cease further to develop Hanks' land except to the extent of payment of minimum royalty, and would begin development of larger production from its lands to the south, when in fact, without awaiting any settlement with him, the company then was engaged in extensive developments for increased extraction of coal through Hanks' land, had already obligated itself to a lease of further lands to the north, and was actively engaged in their development.

Whatever may have been the facts behind these representations, the evidence shows that Hanks was experienced in the coal industry; that he was still actively and with apparently rational mind engaged in handling his business affairs; that he was working through competent and experienced counsel and was fully advised by him with reference to his rights to re-

cover for haulage, which was not then a large claim but was of increasing importance and involved from date of sale to date of trial some 70,000 tons per year; that the negotiations for settlement of the haulage claim and of sale of the property extended over a period of many weeks; that Hanks had full right of access and information as to the actual quality of the coal and alleged intrusion of rock and the development work being done in the mine so that there is nothing in the representations or the situation of the parties to constitute actionable fraud through positive misrepresentations. "A sale cannot be set aside on account of the vendor's representations concerning the value of the subject-matter, however false or exaggerated, if the purchaser was dealing on equal terms with him and either knew as much as he did about the value, or had an opportunity to inspect and appraise the property, or had at his command the means of acquiring all the information necessary to enable him to form a correct judgment, and is not in any way prevented or dissuaded from making his own investigation." 1 Black on Rescission and Cancellation (2d ed.), p. 220, §81. In fact plaintiff in error does not contend that the sale was voidable on the ground of positive fraud, but urges rather that these misrepresentations conjoined with Hanks' failing mental capacity are sufficient evidence of unfairness and inequality of the parties to constitute constructive fraud when considered in connection with the gross inadequacy of consideration.

Inadequacy of consideration is evidence from which fraud may be inferred. Such evidence may be weak or strong. Inadequacy so gross as to shock the conscience is such convincing evidence of fraud as to shift the burden of the evidence upon the party seeking to enforce the contract. Relief is given in equity, however, not on the ground of the inadequacy, but on the ground of the fraud as evidenced thereby. *Dittbrenner v. Myerson*, 114 Colo. 448, 167 P. (2d) 15. The question

to be determined is not whether the consideration was inadequate, but whether the transaction was in fact the result of independent judgment or was induced by coercion or imposition so as not to constitute the free and considered act of the party; whether, in ancient phrase, it was "wittingly and willingly entered into." "The rule is well settled that where the parties were both in a situation to form an independent judgment concerning the transaction, and acted knowingly and intentionally, mere inadequacy in the price or in the subject-matter, unaccompanied by other inequitable incidents, is never of itself a sufficient ground for canceling an executed or executory contract." 3 Pomeroy's Equity Jurisprudence (5th ed.), p. 629, §926. "Hence it is a general rule that if a party enters into a contract or any other legal transaction with sufficient mental capacity to understand it, and not under the influence of fraud, coercion, or imposition, the courts will not relieve him of the consequences of his act on the sole ground that the bargain is, as to him, improvident, rash, foolish, or oppressive." 1 Black on Rescission and Cancellation (2d ed.), p. 485, §170.

 The price paid by defendant coal company for this property was $5,000 in cash, a five-year lease of the surface and water rights, the value of which appears from the testimony to have been around $4,000, assumption of unpaid balance of $7,305.85 on first mortgage (the balance had been paid by application of coal royalty under assignment provided for on making the mortgage), and the second mortgage of $13,291.38. It is true that this mortgage was given as a bonus in order to procure extension of time on the prior mortgage foreclosed. Such a bonus appears oppressive and unconscionable, but defendants were not parties to it. It was not without consideration and defendants are not shown to have had any knowledge as to its true consideration. They took subject to it. It is true that this second mortgage bore no interest until 1944, so that a grantee might

expect to obtain a liberal discount on payment before maturity, and that in fact the coal company compromised it some time afterwards for $7,700, but there is no suggestion of agreement by the mortgagees for any compromise at the time of the sale and it must be considered at its face value in computing the price paid by defendant company for the property. Accordingly, the full purchase price of the property totaled approximately $29,597.23.

The market value of the land, improvements and water rights at the time of sale appears from undisputed evidence as $13,850 to $14,000. There is no direct evidence whatever in the record bearing on the then market value of the coal rights. There is evidence that the customary royalty on coal is ten cents per ton when removed and that there was an engineering estimate of some 600,000 tons of merchantable coal under this land; but this was only an estimate based on the coal mine inspector's report, and, as the engineer testified, if the depth of the coal should decrease, the estimate would have to be materially altered. Even with satisfactory proof of the amount of marketable coal and of the customary royalty thereon, we have no evidence of its market value or of its then value to Hanks. Capital for development and salesmanship for marketing in a highly competitive field are required to transform its potential value to market value or present actual value, and often lands of great potential wealth in coal have no immediate market or actual value to the owner. We are not unmindful that there was an existing. lease providing for minimum royalty of $2,000 per year for some thirteen years more. This added substantially to its value but it might terminate at any time, if the lessee should default or find physical conditions rendering mining operations unprofitable, and in case of default or termination of the lease, there were no shafts or other facilities on this land for continued operation and removal of coal. This property, as we further note, was strate-

gically located so that the coal company was almost under necessity of moving the coal from its north property by haulage way through this land and of being consequently subject to claim for customary two cents per ton royalty thereon; however, such payment had been refused and any recovery would probably have required extended litigation and its future amount was problematical. Finally, it may be noted as suggestive of the uncertain value of this coal that Hanks had been unable by the combined and diligent efforts of himself, his son and his attorney to borrow $16,000 on this property in 1934 at the time of the mortgage foreclosure, and during the months of negotiation between these parties there was apparently no suggestion of attempting to find a purchaser at a better price either by Hanks' son or by his attorney. From these facts it cannot be said that the payment of approximately $15,000 for these coal rights was so gross or shockingly inadequate as to raise a presumption of fraud, nor so inadequate, when considered in connection with the condition of the parties, as to constitute the clear and convincing proof required to establish that the transaction was the result of coercion or imposition.

Accordingly, the judgment is affirmed.