## No. 20573.

ROBERT VANCE DAVIS, A MENTAL INCOMPETENT,
BY MARGARET DAVIS, HIS WIFE AND NEXT FRIEND, *v*.
THE COLORADO KENWORTH CORPORATION, ET AL.
(396 P.2d 958)

Decided November 30, 1964.

A. H. HITCHCOCK, MICHAEL T. VAGGALIS, for plaintiff in error.

GRANT, SHAFROTH, TOLL & McHENDRIE, PETER J. CROUSE, for defendant in error Colorado Kenworth Corporation.

HUGHES & DORSEY, EDWARD B. CLOSE, JR., for defendant in error Montgomery Ward, Inc.

COMSTOCK & COMSTOCK, for defendant in error Colorado Utility Trailer Sales Corporation.

*In Department.*

Opinion by MR. JUSTICE DAY.

WE will refer to the parties by name.

Davis, a mental incompetent, filed suit through his wife as next friend, seeking money judgments against the following: Against Colorado Kenworth Corporation in the amount of $9,058.90 paid on a contract to purchase a Kenworth Tractor for a total price of $15,000.00, plus financing fees; against Colorado Utility Trailer Sales Corporation in the amount of $8,693.75 paid on a contract to purchase a Thermo-King refrigeration unit for a total purchase price of $17,450.00, plus financing fees; against Montgomery Ward, Inc., for $242.50 paid on a total purchase price of $1,215.00 for tires; against Flood and Peterson, Inc., for $1,000.00 paid in premiums on various insurance policies insuring the above equipment, on which there was a balance due and owing of $61.85. In addition to his prayer for money paid out as alleged, Davis also sought cancellation and rescission of the various contracts of purchase with the named defendants. He also alleged that he entered into a contract to sell the "equipment" to Ben A. Lucero and Dolores M. Lucero, and prayed for rescission and nullification of that contract.

To support his claim for return of the various sums he had paid out and for the cancellation and rescission of the various contracts, Davis alleged that at all times he was "an insane person who has been duly adjudicated an insane person by a court of record on or about 5 October 1951, and no order of restoration has been entered as to him since said date." He further alleged that the contracts were void under the provisions of C.R.S. '53, 71-1-21.

Trial was had to the court, and at the close of all of the evidence produced by the plaintiff on his claims, defendants filed a motion to dismiss the action. It was granted, and judgment of dismissal was entered against

Davis, together with a judgment in favor of Montgomery Ward against Davis on a counterclaim for the balance due on the tires. Davis is here challenging the correctness of said judgments.

Davis admits that his right to recovery depends upon the interpretation of the provisions of C.R.S. '53, 71-1-21, which provides, in material part:

"All contracts, agreements and credits with or to any insane person, shall be absolutely void as against such person, his heirs, or personal representatives; but persons making such contracts or agreements with any insane person shall be bound thereby at the election of his conservators * * *."

Davis contends that he comes within the purview and meaning of the statute because on the October, 1951, date he was found not guilty by reason of insanity in a criminal proceeding wherein he had been charged with the crime of larceny. He argues that for the purpose of the statute there is no distinction between his insanity adjudication in the criminal proceeding and a similar adjudication in the county court under the mental health laws.

■■ We do not agree with the argument advanced by Davis. To do so would nullify another section of the same article under which Davis asserts his statutory rights. C.R.S. '53, 71-1-32, passed by the legislature in 1957, prior to the date of the contracts in question, provides in pertinent part:

"* * * Any person who has heretofore been adjudicated under the provisions of any Colorado law relating to mentally ill or mentally deficient persons, *except those pertaining to the criminally insane,* shall be deemed to have been adjudicated under the provisions of this article appropriate in such instance; and his care, custody and *rights* shall be governed by this article from its effective date." (Emphasis supplied.)

Those persons who have been determined criminally insane prior to the enactment in 1957 have been ex-

pressly excluded from the act and "care, custody and *rights*" thereunder. It is to be noted that the entire article has no provisions dealing with the criminally insane, and from a reading thereof in its entirety it is plain that what is contemplated is a civil proceeding in which there is an appointment of a conservator to manage affairs of the incompetent and to whom is given the right to make an election as to the contracts on which the mental incompetent may be bound. The article also indicates a legislative intent to place in county courts *exclusive* and continuing jurisdiction over the affairs of the mental incompetent. *Zimmerman v. Angele,* 137 Colo. 129, 321 P.2d 1105.

Because Davis had not been adjudicated as provided in C.R.S. '53, 71-1-32, what then was the status of the contracts he seeks to nullify? We hold that the contracts were not void but voidable. It was a question of fact for the court to decide whether they should be voided. As was said by this court in *Green v. Hulse,* 57 Colo. 238, 142 Pac. 416:

"* * * The distinction between a void and voidable instrument of insane persons was ignored. Persis Hulse had not been adjudged insane by any competent tribunal at the time she made the deed. The great weight of authority is, that deeds of persons in fact insane, but not so adjudged, are generally held to be voidable and not absolutely void. (citing cases)"

There was ample evidence to support the judgment of the court in which Davis was held not entitled to relief from his contracts. He had escaped from the State Hospital for the Insane at Pueblo five years previously. During the same period he had entered into a marriage with one Margaret Davis, who, as his wife and next friend, brought the present suit. There was no claim that Davis had been overreached. Everyone who dealt with him did so on the basis of good faith.

The test of when the court should nullify a voidable contract was announced in *Hanks v. McNeil Coal*

*Corporation,* 114 Colo. 578, 168 P.2d 256. A slight distinction in the factual situation in the Hanks case was that *Hanks* had been adjudicated insane three years after the contracts involved, and there was therein an attempt to establish that his incapacity dated back to the time of the contract. Since there was in the *Hanks* case, as here, an absence of adjudication as contemplated by the statute, the court said: "* * * The legal test of Hanks' insanity is whether 'he was incapable of understanding and appreciating the extent and effect of business transactions in which he engaged.'"

The Hanks case is authority for the proposition that one may be insane on some subjects and still have the capacity to contract. The inability to form criminal intent is therefore not determinative in this case. That Davis had the capacity to know and understand his transactions is clearly demonstrated by the fact that he had borrowed $10,000.00 from a bank to start his trucking business and had opened an account in the name of Davis Trucking. With a portion of the $10,000.00, he purchased the equipment heretofore described. He entered into a lease arrangement with Ringsby Truck Lines, and for a period of a year he engaged in the trucking business. Much of the money, with which he made payments on the equipment and which he now seeks to have returned, was generated by the business operations and use of the equipment. The operating revenues were deposited in a checking account, and payments were made out of that account. During the year, he never missed a payment on either the tractor or the trailer as he was well aware of his obligations and responsibilities.

In July, 1960, Mr. Davis, for some reason not disclosed by the record, found himself financially unable to make the usual monthly payment. He thereupon borrowed $440.00 from the defendant Lucero for this particular purpose. Lucero was his bookkeeper. Shortly thereafter, Davis agreed to sell his equipment to Lucero.

He valued his equity in the equipment at $1,600.00, for which Lucero paid him. Thereafter, the equipment was damaged in an accident. Lucero defaulted on his payments, and the equipment was repossessed from Lucero.

It also appears from the evidence that Davis neither offered to nor could he, in fact, do equity by restoring the status quo of the parties. The equipment had been operated extensively. It was deteriorated by use, and it had been damaged in an accident. The tires had also been used since their purchase. We therefore further hold that Davis' failure to do equity also defeated his right to rescission. The general rule is found in 29 Am. Jur. Insane Persons 215, wherein it is stated:

"*Executed Contracts — Restoration of Status Quo. —* The fact that a contract is executed does not of itself preclude its avoidance on the ground of the mental infirmity of a party thereto. The great weight of authority, however, supports the rule that where a contract with an insane person has been entered into in good faith, without fraud or imposition, for a fair consideration, of which the incompetent has received the benefit, without notice of the infirmity, and before an adjudication of insanity, and has been executed in whole or in part, it will not be set aside unless the parties can be restored to their original position. This rule applies to transactions with intoxicated persons to the same extent as to transactions with insane persons. If goods are sold to a person apparently of sound mind, who is not known by the seller to be insane and has not been so found in a proper proceeding for that purpose, and the contract is fair, and the purchaser receives and uses the goods, whereby the contract becomes so executed that the parties cannot be placed in statu quo, such contract cannot later be set aside because of the unsoundness of the mind of such purchaser at the time of the sale; nor can payment for the goods be avoided, either by the alleged lunatic or his representative * * *.

"* * * The courts have made reasonably clear the

judicial concept which motivates the enforcement of the contracts of an insane person in such situations. They are enforced against the insane person, not because such agreements possess all the legal characteristics of a binding contract, but primarily because the insane party has secured a benefit in the transaction which it would be inequitable to allow him to retain, without first restoring to their original position those who conferred such benefit, or with whom he entered into the agreement. Stated differently, it is grossly unfair to allow a person to repudiate a contract without returning, or offering to return, the benefits which he received thereunder. The rule which conditions a rescission of a contract upon the restoration of the status quo by the person seeking to avoid the obligation on the ground of his insanity is based upon principles of equity, as well as upon public policy and good faith."

Numerous Colorado cases establish the legal necessity of restoring the status quo in actions for rescission. *Laramie Poudre Irrigation Co. v. Redfeather Lakes Resort, Inc.,* 94 Colo. 479, 31 P.2d 917; *Gertner v. Limon National Bank,* 82 Colo. 13, 257 Pac. 247; *Central Life Assurance Soc. v. Mulford,* 45 Colo. 240, 100 Pac. 423; *Auld v. Travis,* 5 Colo. App. 535, 39 Pac. 357.

The undisputed facts are that Davis used the equipment; that he obtained considerable monies through their use, during which time the equipment was worn and depreciated, and subsequently wrecked; that he sold his equipment for a price which he determined was the equity he had in it, and, finally, that he kept the money. He returned nothing to any of the parties. The fact that the equipment was repossessed from a third party who had assumed Davis' obligations does not aid him in his quest for rescission.

The judgment is affirmed.

MR. JUSTICE MOORE and MR. JUSTICE SUTTON concur.