ESTATE OF ELEANOR BUCHANAN TALBOTT, DECEASED, BRYAN CARVER, EXECUTOR, HOT SPRINGS, VIRGINIA, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4820–66. Filed June 14, 1967.

*Walter E. Barton*, for the petitioner.
*E. M. Paturis*, for the respondent.

OPINION

DAWSON, *Judge:* Respondent determined a deficiency in estate tax against the Estate of Eleanor Buchanan Talbott in the amount of $67,217.77.[1]

Some adjustments made in the notice of deficiency have not been contested by petitioner. Additional deductions claimed for administrative expenses will be resolved in the Rule 50 computation. This leaves only one issue for our decision: Did the decedent make transfers to a trust prior to March 4, 1931, within the meaning of section 2036(b), I.R.C. 1954,[2] so as to exclude the value of the properties from her gross estate?

The facts have been fully stipulated by the parties and are hereby found accordingly.

Eleanor Buchanan Talbott (hereinafter called decedent) died on December 30, 1962, while a resident of Hot Springs, Va. Bryan Carver (hereinafter called petitioner), a resident of Hot Springs, Va., at the time this petition was filed, is the duly appointed executor of her estate. The Federal estate tax return for the decedent's estate was filed with the district director of internal revenue at Richmond, Va.

On July 5, 1923, the decedent created a trust, relevant portions of which are set forth below:

THIS INDENTURE, made the 5th day of July, 1923, by and between ELEANOR B. TALBOTT, residing at Baltimore, Maryland, party of the first part, and EQUITABLE TRUST COMPANY OF NEW YORK, a corporation duly organized and existing under the banking laws of the State of New York, having its principal office for the transaction of business at No. 37 Wall Street, Borough of Manhattan, City of New York, party of the second part, herein called the "Trustee."

---

[1] In arriving at this net deficiency in his notice of deficiency, the respondent took cognizance of the estate's right to a credit for State death taxes, if paid, in the amount of $4,524.20.

[2] All references herein are to the Internal Revenue Code of 1954 unless otherwise indicated.

WHEREAS, the party of the first part desires to create a trust for certain purposes and to have the party of the second part become trustee thereof; and

WHEREAS, the party of the second part is authorized under the laws of the State of New York to act as such trustee and is willing to accept the said trust,

NOW THEREFORE, THIS INDENTURE WITNESSETH, that, in consideration of the premises, the mutual covenants herein contained and other good and valuable consideration, and of the sum of One Dollar ($1) to her in hand paid by the party of the second part, at or before the ensealing and delivery of these presents, the receipt whereof is hereby acknowledged, and the acceptance by the Equitable Trust Company of New York of the trusts hereinafter declared, the party of the first part has granted, conveyed, assigned, set over and delivered, and by these presents does grant, convey, assign, set over and deliver unto the party of the second part and its successors, all of the right, title and interest of the party of the first part in and to the securities and other properties and rights with the appurtenances thereto, set forth in the Schedule annexed, which is hereby made a part of this instrument, and which securities, properties and rights, together with any addition thereto, are herein collectively called the "Trust Fund."

To HAVE AND TO HOLD all and singular the above granted and described securities, properties and rights, and any additions thereto, unto the said party of the second part and its successors, IN TRUST NEVERTHELESS, during the lives of the party hereto of the first part, and WILLIAM M. TALBOTT of Baltimore, Maryland, persons now in being, for and upon the following uses and purposes and subject to the terms, conditions, powers and agreements hereinafter set forth.

FIRST: To conserve and diligently protect the Trust fund, and to receive, hold, manage, sell, invest and reinvest the same and every part thereof, in its sole discretion, subject to the conditions and limitations herein contained, and to collect, recover and receive the rents, issues, interest and income thereof, and of all proceeds and any reinvestments of the same and of any part thereof, including any interest and income already accrued, hereinafter called the "Income," and after deducting its commissions as hereinafter provided and the proper and necessary expenses in connection with the administration of the trust, to pay the said income in monthly instalments of equal amount, or as nearly equal as possible, unto William M. Talbott and the party hereto of the first part, for and during the term of their joint lives, and upon and after the death of either said William M. Talbott or the party hereto of the first part, then unto the survivor for and during the term of his or her natural life, or until terminated as hereinafter set forth.

SECOND: Upon the death of the said William M. Talbott and the party hereto of the first part, if this trust has not sooner been terminated as hereinafter provided, to pay, convey, assign, set over and deliver this trust fund, together with any accumulated and any unpaid income thereon, unto ALLEN T. TALBOTT and CHARLES FOSTER TALBOTT, both of Baltimore, Maryland, brothers-in-law of the party hereto of the first part, and MRS. HATTIE A. BURNS, of Junction City, Kansas, and MRS. MINNIE J. KARIGAN of San Francisco, California, or the survivors of them, in equal shares, and to the issue of any of the above named who shall have died leaving issue living at the death of the survivor of William M. Talbott and the party of the first part,

such issue of any of the four above mentioned persons who shall have so predeceased the survivor of said William M. Talbott and the party hereto of the first part dividing equally among them the share their parent would have taken if living.

\* \* \* \* \* \* \*

TENTH: Notwithstanding anything to the contrary herein contained, this agreement or the terms thereof may, from time to time, during the continuance of the trust hereby created, by instrument of the party hereto of the first part and said William M. Talbott, or by the survivor of them, together with Charles F. Talbott, in writing, executed and acknowledged in the manner required for a deed of real property so as to enable it to be recorded in the State of New York and delivered to the Trustee, modify or alter in any manner, or revoke in whole or in part, this indenture and the trusts then existing, and the estates and interests in property hereby created, and in case of such revocation said instrument shall direct the disposition to be made of the trust fund or of the portion hereof affected by such revocation, and the Trustee shall make, execute and deliver such instruments, and make such conveyances and transfer of property as may be necessary or proper in order to carry the same into effect.

A list of the securities transferred to the trust by decedent was attached to the trust agreement. Decedent transferred other securities to the trust corpus in November 1929. Subsequently, on October 3, 1932, and again on April 10, 1933, the decedent and William M. Talbott exercised their power under paragraph 10 of the trust indenture and partially revoked the trust through the withdrawal of specified securities.

William M. Talbott was the husband of the decedent. He died on November 15, 1935. Charles F. Talbott, who is also mentioned in the trust indenture, died on March 6, 1937.

On June 9, 1943, the decedent signed an instrument directing the trustee on how to apportion the funds received from the distribution of specified bonds between the trust income and principal.

In 1964, the successor trustee of the above trust made an application to the Supreme Court of the State of New York, County of New York, for instructions, judicial settlement of its final account of proceedings, and for construction of the trust indenture. In its final order, index No. 1360/1964, the court ordered "that Eleanor B. Talbott had no authority to revoke the trust to the extent contained in the instrument executed by her on June 9, 1943; \* \* \*"

The trust was still in existence at the time of Eleanor B. Talbott's death.

The petitioner contends that decedent's transfer of securities to the trust occurred prior to March 4, 1931, thus falling within the provisions of section 2036(b). Petitioner also contends that the trust indenture created two consecutive joint powers to modify, alter, or

revoke the trust in whole or in part;[3] that the decedent never had a unilateral power to modify, alter, or revoke the trust; and that any power to modify, alter, or revoke the trust terminated upon the death of Charles F. Talbott in 1937.

Respondent maintains that William M. Talbott, the decedent's husband, was not an adverse party with regard to the power to modify, alter, or revoke the trust remainder. Therefore, he argues that the decedent retained, until her husband's death in 1935, the unilateral right to revest the trust remainder in herself and that she did not, as a result, effectuate a completed transfer of the trust property until that time. Thus, he takes the position that the decedent's transfer did not fall within the exception contained in section 2036(b) and the property must be included in her gross estate under the provisions of section 2036(a).

The decedent created the trust in 1923. The trust indenture provided for income to her and her husband during their joint lives, then to the survivor of them for his or her life, with the remainder to four specified persons, including Charles F. Talbott, or their issue. Decedent and her husband had the power to modify, alter, or revoke the trust during their joint lives, such power then passing to the survivor of them and Charles F. Talbott during their joint lives. On March 4, 1931, both decedent and her husband were alive and they had the power to modify, alter, or revoke the trust as of that date.

Petitioner argues that the decedent could revoke the trust only through a joint action with the appropriate party; respondent argues that she only needed that party's consent. Under either theory, however, the trust was revocable on March 4, 1931, since on that date the decedent could revoke it in conjunction with her husband and he, having only a life estate, did not have an adverse interest in the remainder. See *Estate of Abraham Koshland*, 11 T.C. 904 (1948), affd. 177 F. 2d 851 (C.A. 9, 1949).

The parties agree that the trust property is includable in decedent's gross estate under section 2036(a)[4] if the exception provided in section

---

[3] The parties agree that the 10th paragraph of the trust indenture must be interpreted to mean that the decedent and William M. Talbott had the power to modify, alter, or revoke the trust during their joint lives and that on the death of either, the survivor had this power in conjunction with Charles Talbott. Moreover, the trust indenture was given this interpretation when partial revocations were made in the trust in 1932 and 1933. While we might be inclined to interpret the trust provisions to mean that the decedent and William M. Talbott during their joint lives could act only in conjunction with Charles Talbott, we feel constrained to accept the interpretation agreed upon by the parties to this action and relied upon by the parties to the trust indenture.

[4] SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE.

(a) GENERAL RULE.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money

2036(b) [5] does not apply. Hence, the pivotal question is whether a "transfer" within the meaning of section 2036(b) occurred on July 5, 1923, and in November 1929, the dates on which the title to the securities passed to the trust, or on the date subsequent to March 4, 1931, when the trust became irrevocable.

Respondent relies on *Smith* v. *United States*, 139 F. Supp. 305 (Ct. Cl. 1956), and *Studebaker* v. *United States*, 211 F. Supp. 263 (N.D. Ind. 1962), for the proposition that the date of transfer within the meaning of section 811(c)(1)(B) [6] is the date the trust becomes irrevocable. However, this Court, in four recent cases, has expressed its disagreement with the Court of Claims' interpretation of section 2036(b) and its predecessors. See *Estate of Robert J. Cuddihy*, 32 T.C. 1171 (1959); *Estate of Ellis Branson Ridgway*, 33 T.C. 1000 (1960), affd. 291 F. 2d 257 (C.A. 3, 1961); *Estate of Ellie G. Canfield*, 34 T.C. 978 (1960), affd. 306 F. 2d 1 (C.A. 2, 1962); and *Estate of Newcomb Carlton*, 34 T.C. 988 (1960), reversed on other grounds 298 F. 2d 415 (C.A. 2, 1962). Upon careful examination of the legislative and judicial history [7] of section 811(c)(1)(B) (now sec. 2036(b)), this Court has consistently held that the "transfer" to which section 2036(b) refers is the date of transfer of legal title to the trustee upon the creation of a trust, and not the date on which the trust becomes irrevocable. Using this criterion, we find that the decedent transferred her property to the trust by November 1929, the last date on which she gave securities to the trust. The fact that she retained powers to revoke the trust, so that the trust was revocable as of March 4, 1931, is an irrelevant factor in applying the rule adopted by this Court.

This is the first case to come before us in which the grantor had the right as of March 4, 1931, to revoke the trust without the consent or joint authority of persons having an adverse interest in the trust remainder. At first blush this would seem to be the critical factor since in the *Cuddihy*, *Ridgway*, *Canfield*, and *Carlton* decisions we distinguished the *Smith* case on the ground that, unlike the trust in the *Smith* case which was revocable until 1933, the trusts in the four Tax Court cases were all irrevocable as of March 4, 1931. However,

or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—
   (1) the possession or enjoyment of, or the right to the income from, the property, or
   (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

[5] SEC. 2036(b). LIMITATION ON APPLICATION OF GENERAL RULE.—This section shall not apply to a transfer made before March 4, 1931; nor to a transfer made after March 3, 1931, and before June 7, 1932, unless the property transferred would have been includible in the decedent's gross estate by reason of the amendatory language of the joint resolution of March 3, 1931 (46 Stat. 1516).

[6] This section in the 1939 Code is the identical predecessor of sec. 2036(b).

[7] See the discussion contained in *Estate of Robert J. Cuddihy*, 32 T.C. 1171, 1173–1176, and *Estate of Ellie G. Canfield*, 34 T.C. 978, 986.

after distinguishing the *Smith* case, we further stated in *Cuddihy* (32 T.C. at 1175–1176) :

The respondent's reliance upon the legislative history of section 811(c)(1) is not persuasive because the wording of the statute, which speaks simply of "a transfer made before March 4, 1931," is plain and unambiguous. *Crooks* v. *Harrelson*, 282 U.S. 55; *Alexander C. Yarnall*, 9 T.C. 616, affd. 170 F. 2d 272. Taken in its normal sense, the application of the statutory phrase in question to a transfer in trust appears to refer to the time of the transfer of title to the trustee, rather than to some subsequent time when a retained right or power is released. The exemption section neither mentions nor implies the non-existence of a right to terminate as requisite to an exempt transfer, and we see no reason to read into it an exception not stated or implied.

We are supported in our view of the meaning to be placed on the words "a transfer made before March 4, 1931," by the fact that it is consistent with the statutory usage of the word "transfer" in section 811. Section 811(d), for example, imposes an estate tax on a "transfer" that is revocable by the decedent. Section 811(c)(1)(B) taxes a "transfer" under which the decedent has retained possession, enjoyment, or the right to income from the transferred property. Section 811(c)(1)(C) taxes a "transfer" intended to take effect in possession or enjoyment at or after his death. It is, therefore, apparent that the word "transfer," as used in section 811, does not necessarily refer to an absolute or completed transfer of the entire beneficial interest in the conveyed property. Identical words used in different parts of the same statute must be construed to mean the same thing unless a contrary meaning is clearly shown. *United States* v. *Olympic Radio & Television*, 349 U.S. 232; *Helvering* v. *Stockholms Enskilda Bank*, 293 U.S. 84.

For the foregoing reasons, we are of the opinion that the transfer to which the last sentence of section 811(c) refers is the transfer of legal title to a trustee upon the creation of a trust prior to March 4, 1931. A transfer in trust under which a settlor retains a right to join in a termination solely in favor of his children clearly falls within the terms of that exemption. We accordingly hold that the transaction here involved, which occurred on May 20, 1926, is excluded from the operation of section 811(c)(1)(B).

The *Cuddihy* decision was followed in the *Ridgway*, *Canfield*, and *Carlton* cases which reiterated this position. Thus the basic rationale of this Court is that the statutory provision does not refer to an absolute or completed transfer of the entire beneficial interest in the conveyed property.

In the *Ridgway* case, the Court of Appeals for the Third Circuit avoided a direct conflict with the Court of Claims by distinguishing *Smith*, although it stated that the dissenting opinion of Judge Laramore expressed the better view. In *Canfield*, the Court of Appeals for the Second Circuit also distinguished both *Smith* and *Studebaker* to the extent that the language of those opinions was contrary to its own. However, it specifically refrained from expressing an opinion with respect to a situation involving a trust *revocable* by the settlor acting alone or in conjunction with a nonadverse party.

It is clear that the rule in this Court is that the date of "transfer" within the intendment of section 2036(b) is the date the title passes to the trustee. Despite respondent's nonacquiescence in our prior decisions, his adherence to Rev. Rul. 277, 1953-2 C.B. 265, and his persistence in litigation, we are not disposed to chart a new course now. We decline to include the additional requirement that the "transfer" must be irrevocable at the time title passed to the trustee. See *Estate of Ellie G. Canfield, supra* at 986; *Estate of Ellis Branson Ridgway, supra* at 1003; *Estate of Robert J. Cuddihy, supra* at 1175–1176; and the dissenting opinion in *Smith* v. *United States, supra* at 313. This interpretation of the statute compels the conclusion that all pre-March 4, 1931, "transfers" fall within the exception contained in section 2036(b) regardless of any power to revoke which the grantor may have retained. Consequently, we hold that when the decedent transferred title to her securities to the trustee in July 1923 and November 1929, she made a transfer prior to March 4, 1931, which comes within the exception provided by section 2036(b). Hence, section 2036(a) does not apply to include the value of the trust property in the decedent's estate for estate tax purposes.

*Decision will be entered under Rule 50.*