ESTATE OF MAY C. MALONE, DECEASED, THE COLORADO NATIONAL BANK OF DENVER, ADMINISTRATOR, C.T.A., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Malone v. Commissioner
Docket No. 4037-73.
United States Tax Court
T.C. Memo 1976-16; 1976 Tax Ct. Memo LEXIS 385; 35 T.C.M. (CCH) 50; T.C.M. (RIA) 760016; January 26, 1976, Filed *385 A trust created in 1933 gave decedent a life estate. Nine months before her death, decedent assigned her rights in the trust to her son. Held, (1) decedent was creator of the trust; (2) the trust spendthrift clause did not invalidate her assignment; (3) decedent was not mentally capable of legally assigning her interest; (4) the assignment was made in contemplation of death within the meaning of section 2035, I.R.C. 1954; and (5) the trust is accordingly includable in decedent's gross estate under sections 2035 and 2036, I.R.C. 1954. Frank M. Cavanaugh, for the petitioner. Vivian T. Martinez, Jr., for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined an estate tax deficiency of $196,262.22 against the Estate of May C. Malone (sometimes hereinafter decedent), who died on January 10, 1969. The sole issue for decision is whether the fair market value of a certain trust was includable in decedent's gross estate. FINDINGS OF FACT Petitioner is the Estate of May C. Malone, The Colorado National Bank of Denver, Administrator, C.T.A. (hereinafter Colorado National Bank). Colorado National Bank filed a United States Estate Tax Return, Form *386 706, for that estate with the Internal Revenue Service, Service Center, Austin, Texas, on April 14, 1970. The principal office of Colorado National Bank is at Denver, Colorado. The decedent, May C. Malone, was born on May 12, 1879. She married Richard H. Malone, a domineering man, in 1910; at that time, she had $25,000 to $30,000 in separate property. May C. Malone was the second spouse of Richard H. Malone, who had three children from a prior marriage. John C. Malone, the only child of Richard H. and May C. Malone, was born on July 1, 1916. From 1910 through 1926, the property which May C. Malone brought into the marriage was reflected on separate books of account which showed additions from interest, dividends and rents. Income was allowed to accumulate. Beginning about 1918, Richard H. Malone at irregular intervals transferred property to May C. Malone. Some items of property were credited to her capital account, and some were credited to her as "Trustee for John C. Malone," although there was apparently no express trust for that purpose. The bulk of these transfers occurred from 1919 to 1922. Richard H. Malone desired by these transfers to make provision for his wife and son by *387 giving them separate property. May C. Malone had a separate bank account from at least 1914 through at least February 18, 1937, the date of Richard H. Malone's death. In addition to the books of account maintained for her separate property, the separate character of her property was shown by safekeeping accounts and by stock issued in her own name, as for example 50 shares of Ideal Basic Industries, Inc. stock issued in her name on January 2, 1925. As early as January 8, 1923, Colorado National Bank issued a receipt for securities valued at approximately $125,000 held for safekeeping and subject to decedent's order. There is also evidence that she filed separate income tax returns for years prior to 1926. A trial balance for May C. Malone as of March 31, 1926, showed the following assets: Cash
$ 8,798.97
Bills Receivable
12,500.00
Bonds
61,320.58
Olympia
3,933.33
Real Estate
43,778.21
Stocks
176,773.96
Stocks & Bonds
Trust Account
54,570.26
May C. Malone for
J.C.M.
$ 54,570.26
Dividends
2,154.50
Interest
670.98
May C. Malone
(personal)
42.00
May C. Malone -
Capital
304,237.57
$361,675.31
$361,675.31 The fair market value of her assets on that date was $361,675.31, in contrast to a book value of $250,217.75. On *388 July 6, 1926, May C. and Richard H. Malone executed a Memorandum of Agreement in which May C. Malone disclaimed any interest in a trust Richard H. Malone created on that date for the children of his first marriage. Colorado National Bank was trustee of that trust. In consideration for this disclaimer, May C. Malone acknowledged receipt of securities valued at $250,594.54 for her own benefit and receipt of securities valued at $54,570.26 as trustee for John C. Malone. A copy of the March 31, 1926, trial balance was attached to the Agreement. That trial balance, set forth above, showed as of March 31, 1926, that May C. Malone was holding $54,570.26 for John C. Malone as trustee; furthermore, the aggregate of Bills Receivable ($12,500.00), Bonds ($61,320.58), and Stocks ($176,773.96) equalled the consideration stated in the agreement of $250,594.54. On July 25, 1927, May C. Malone created a trust "for the use and benefit of her husband, Richard H. Malone, and their son, John C. Malone." Corpus consisted entirely of property standing in the name of May C. Malone prior to July 6, 1926 and at creation of the trust. Colorado National Bank was also trustee of this trust. Net income was to *389 be paid half to May C. Malone and half to Richard H. Malone so long as they live. No investment was permitted without the approval in writing of May C. Malone and, during his lifetime, Richard H. Malone. May C. Malone could modify or revoke the trust with Richard H. Malone's written consent, but she retained no such power after his death. The 1927 trust was amended four times between 1927 and 1931; all four amendments refer solely to decedent as creator of that trust. On June 29, 1933, May C. Malone executed a trust agreement with Colorado National Bank which provided, in part, as follows: WITNESSETH:
THAT, WHEREAS, May C. Malone, named Donor therein, heretofore by virtue of a certain written Trust Agreement dated the 25th day of July A.D. 1927, created a Trust for her husband and their son, John C. Malone, which said written Trust Agreement was known and numbered on the books and records of the Trust Department of the said Colorado National Bank as Trust Agreement No. 2944 * * *
WHEREAS the Creator, May C. Malone, desires with the consent in writing of Richard H. Malone, which consent is evidenced by the signing hereof by said Richard H. Malone, to change, modify and alter the terms *390 and provisions of said Trust Agreement No. 2944 and also the said modifications thereof heretofore made, in certain particulars, and also desires to revoke in whole the said Trust Agreement No. 2944 and revoke in whole the said modifications thereof made thereto and it is deemed and decided best that such alterations, modifications and changes had best be made by means of a revocation of said original Trust Agreement No. 2944 and the modifications thereto and a new and complete Trust Agreement made in lieu thereof, and WHEREAS the Creator hereof, May C. Malone, desires with the consent in writing of Richard H. Malone, said consent evidenced as aforesaid, to create a new Trust Agreement upon the terms and conditions herein set forth. NOW, THEREFORE, In consideration of the premises and for the purposes of accomplishing the objections herein more particularly set forth, the Creator hereof, May C. Malone, with the written consent of Richard H. Malone evidenced as aforesaid, has revoked, cancelled and annulled in whole and does hereby revoke, cancel and annul said Trust and said Trust Agreement known and numbered as Trust Agreement No. 2944 and the modifications thereof and does hereby *391 publish and declare this written agreement is a new Trust Agreement in the place and stead of said Trust Agreement No. 2944 and the modifications thereof
* * *
[No] beneficiary shall have the right or power to transfer, assign, anticipate, or encumber his or her interest in said Trust Estate or the income therefrom prior to the actual distribution thereof by the Trustee as to such beneficiary. * * * In the event that any of the beneficiaries hereunder shall attempt to alienate or dispose of any of the income or principal to which he or she shall be entitled under this Trust Agreement, prior to distribution * * * then the trust expressed in this Agreement concerning so much thereof as might vest in such other person or persons shall immediately cease and determine. * * * [Emphasis added.] That same day, May C. and Richard H. Malone executed a Memorandum of Agreement which reaffirmed the disclaimer agreement of July 6, 1926, insofar as a new trust executed on June 29, 1933, was substituted by Richard H. Malone for the trust he created for the children of his first marriage. On July 17, 1933, the 1927 trust instrument was stamped "CANCELLED" in large letters on its first and last pages. *392 On February 26, 1936, the 1933 trust was amended by May C. Malone, with the written consent of Richard H. Malone. The Amendment of Declaration of Trust Agreement provided, in part, as follows: WHEREAS, by a certain declaration of trust agreement dated June 29, 1933, May C. Malone, therein and hereinafter designated "Creator," by agreement with The Colorado National Bank of Denver, Colorado, as Trustee, deposited certain property, now held by said Trustee under the terms thereof; AND WHEREAS, in said trust agreement it is provided that the Creator may change, add to, or modify any of the terms thereof; NOW, THEREFORE, the Creator changes, modifies, and alters said declaration of trust agreement, and all amendments thereto, so that said property, and the income thereof, shall be held, administered, handled, and distributed as herein provided. * * *
7. [After payment of all necessary expenses], all of the remaining income therefrom shall be paid as follows: (a) To Richard H. Malone, as long as he lives. (b) If the Creator survives Richard H. Malone, then, after the death of Richard H. Malone, to the Creator, as long as she lives * * *. * * *
9. No part of the trust estate shall ever be *393 subject to any judgment, decree, execution, garnishment, attachment, order of court, or other process for any debt or obligation of or demand against any of the respective beneficiaries thereof, or be appropriated or taken in any manner or form whatsoever therefor, nor shall any part thereof, while remaining in the hands of the Trustees be subject to any anticipation, diminution, or assignment, in any form, by the act of any such beneficiary, or to having any debt or obligation of, or demand against, any such beneficiary charged upon the same or deducted from any payment of income by any form, plan, device, or process whatsoever, but during the lifetime of each of such beneficiaries, their said respective payments shall always be and be held to be created for the personal and individual use and benefit of such beneficiaries, respectively; and, in the case of any female beneficiary, all such payments shall always be, and continue to be, the sole and separate property and estate of such female, notwithstanding coverture, as well after coverture as before, and no part of any such payments shall ever be taken for, or be subject in any manner or form whatsoever to, the payment or satisfaction *394 of any debt or obligation or demand of any nature whatsoever against any husband of any such female, or subject in any manner or degree whatsoever to the control of any such husband, nor shall any part of any such payments to any male beneficiary be subject to any debt of or claim against his wife. * * *
The right is expressly reserved to the Creator, with the consent of Richard H. Malone, to remove any Trustee at any time during the lifetime of Richard H. Malone. * * *
12. At any time, and from time to time, during the life of Richard H. Malone, the Creator, with the consent of Richard H. Malone, reserves the right to revoke, modify, or amend the trust agreement, in whole or in part, to withdraw any property from the trust estate, or to add additional securities, or property, to the trust estate. Richard H. Malone died on February 18, 1937. Schedule G of the Estate Tax Return for his estate, filed on May 19, 1938, described the Memorandum of Agreement of July 6, 1926, and stated that the transfers to May C. Malone pursuant to that agreement "are not considered to be taxable." The return was filed by May C. Malone and Hugh McLean, a trust officer of Colorado National Bank. On March 23, *395 1939, Estate Tax Agent Lowden Sammis prepared a report about the Estate of Richard H. Malone which stated, in part, as follows: Mrs. Malone has stated unequivocally to examining officer, on several occasions, that when the 1926 agreements were executed, there was no understanding she was to create the trust created by her in 1927, and that she created that trust and permitted her husband to share in the income and right of revocation because of her confidence in her husband, her lack of business experience and skill and the fact that her husband was paying the expenses of the family. No evidence was found which would contradict her statement, hence no resulting trust can be inferred, by which she held the property between the two dates for her husband. For this reason and the fact she had complete dominion over the property placed in the 1927 trust, no ground for the inclusion of that trust in the gross estate is evident, unless it can be held that the transfers to Mrs. Malone were in contemplation of death. The health and age of the decedent, the period over which the transfers occurred, the fact that much of the property was always Mrs. Malone's, and the absence of motive expressed *396 as associated with death, lead to the conclusion that these transfers could not be held taxable and they are not recommended included. On January 4, 1961, May C. Malone was admitted as a patient at Swedish Hospital in Englewood, Colorado. The reason for admission given was "back injury and age." Decedent was 81 years old at that time. Evidence as to decedent's physical and mental health during her stay at Swedish Hospital is mixed. Mentally, her physician during that time, Dr. Stephen Goodman, described her as "mentally clear * * * fairly articulate, fairly cheerful." Mrs. Gladys Stearns, her principal nurse from 1961 through January of 1968, also agreed that she was a lively, cheerful person who never discussed death, illness or her own physical health. On the other hand, medical records of Swedish Hospital contain such comments as "still very lethargic and confused" (March 8, 1965), and "mentally much brighter but mind wanders" (July 6, 1966). Physically, Dr. Goodman suspected that a colon lump was cancerous and malignant, but he decided that decedent could not tolerate surgery for removal of the lump. He described her as "a very frail, fragile, elderly woman who had experienced *397 a stroke before I knew her. She was paralyzed on one side of her body. She was very weak and sick and frail and fragile." Also, medical records of Swedish Hospital show decedent was subject to generalized arteriosclerosis, senility 2 degree, a history of glaucoma, mild dehydration, and deterioration. On the other hand, Dr. J. Frederic Prinzing, Jr., who was decedent's physician in 1968 and who was aware of the possibility that decedent had cancer of the colon, found no evidence of such a cancer. In his opinion, decedent probably would not have survived from 1962, when the cancer was first suspected, until 1969 if she had had colon cancer; furthermore, he felt it would have manifested itself in other ways, i.e. symptoms, which it did not. He thus felt there was no demonstrable evidence of cancer. Indeed, he felt decedent had "average" health for her age. In any event, it is clear that decedent was never informed of Dr. Goodman's suspicion of colon cancer. Decedent was discharged from Swedish Hospital on February 1, 1967. Her final diagnosis was as follows: "Left hemiplegia due to cerebral artery thrombosis. Probable carcinoma of colon." Dr. Goodman accordingly described the results *398 of her stay as "not improved." On February 1, 1967, decedent was admitted to Aspen Siesta Nursing Home. The admitting nurse's report indicates that her mental condition was alert but confused at times, and records of that nursing home indicate that decedent's mental condition was "confused" a total of 171 out of the 220 days for which records were submitted. Indeed, one recurring comment on decedent's records is "usual confusion." Comments in her medical records at Aspen Siesta Nursing Home include the following: "Thinks 'she is dying.'" (March 22, 1967); "Confused & many illusions. Good day." (April 16, 1967); "Very confused all day." (June 10, 1967); "Nurse says she is more confused all the time." (June 24, 1967); "Possibly losing sight in eye. Sees things that aren't there while not confused. Very noisy." (August 7, 1967); "[complained]/[of] being very sick 'all over.'" (August 17, 1967); "complains of being very tired. 'May not be here in a.m.'" (September 7, 1967); "Cannot forget dream of hers. Has been very suspicious. Very much against taking medications. Feels someone is trying to kill her." (September 26, 1967); "very lethargic/appears ten years older than yesterday." (October *399 14, 1967); "lethargic somewhat. Singing most of eight hours. Speech slurring and very confused." (November 3, 1967); "Very confused, restless & irritable." (November 27, 1967); "good day." (March 27, 1968); "good day. Very cheerful and pleasant." (March 29, 1968); "usual confusion * * * a good day." (March 30, 1968); "Complaining of severe pain in [Right] side. Screams out loudly when being moved * * * very complaining day." (May 5, 1968); "confused. Thinks she is in Illinois, etc., etc." (September 5, 1968); "called for Momma. Did not sing until 2:00 p.m., but still confused." (September 6, 1968); "noisy, irritable, confused, yelling 'Ma ma!'" (September 10, 1968). An entry in those records for March 30, 1968, contained a statement by psychiatrist Robert J. Hilton that decedent "is disoriented in time and place. Has very faulty recent memory, impaired concentration and is negativistic and subtly hostile toward the examiner. * * * Chronic brain syndrome 2 degree cerebral arteriosclerosis." Those records also indicate that decedent was often unable to retain natural discharges and had to be fed by her nurse. Doctor J. Frederic Prinzing, Jr., was asked to examine decedent in a letter *400 dated March 26, 1968, from Frank M. Cavanaugh, Esquire, attorney for petitioner herein. The letter stated that Mr. Cavanaugh and John C. Malone desired a medical determination of decedent's competency to continue to transact personal business, and continued as follows: I would also like to know whether, in your opinion and that of any other doctor you may call in, she would realize the consequences of a transaction wherein she would make a substantial gift of her property or income rights to her son and grandson as heirs at law, which transaction would be to the advantage of her entire family as an estate plan for saving income and es-state taxes, and whether she would fully realize that if she consummated such a transaction FC she would be sufficiently protected in her own separate estate. [1]
On March 28, 1968, decedent executed a "release and Assignment of Life Income Estate in May C. Malone Trust Dated June 29, 1933" which stated that "I herein release, assign and convey over unto John C. Malone all of my right, *401 title and interest in said trust." The stated rationale for the assignment was to provide John C. Malone with "sufficient funds to adequately support his family" because he would "be retiring from Military Service soon with reduced income benefit." The assignment also noted that decedent's "welfare and security are adequately served from the income derived from my personal estate." Ruth D. Horsley, Administrator of Aspen Siesta Nursing Home, specifically asked decedent twice if she knew to whom she was assigning a substantial trust sum on that date, and decedent twice replied "to my son." Also on March 28, 1968, decedent and Mr. Cavanaugh signed a "Petition For Appointment Of Guardian." Decedent requested therein that Colorado National Bank be appointed guardian because decedent, although mentally competent, was unable to properly manage her estate because of old age. On March 29, 1968, Dr. Prinzing wrote Mr. Cavanaugh as follows: Physically, Mrs. Malone shows the debilitations of her 89 years. Mentally, she also shows the effects of these years, especially in the area of recent events. But I should add that altho [sic] I did not mention financial matters specifically in my examination, *402 she appeared to understand fairly well her situation in this area. In my opinion, Mrs. Malone is in need of a Guardian to handle her affairs * * *. I have taken the liberty of requesting R. J. Hilton M.D. to perform [a] second evaluation. In a letter dated April 1, 1968, addressed to Dr. Prinzing, Dr. Hilton evaluated the degree of competence retained by decedent as evidenced by his examination on March 30, 1968, as follows: Mrs. Malone, as you know, is an 89 year old white widowed female who has been debilitated by old age for a number of years requiring a nursing home placement. The results of my interview indicate to me that Mrs. Malone is grossly disoriented to time and place. Her memory for both recent and remote events is quite faulty in that she cannot remember the name of her attending physician, nor the nurse that has cared for her for the past four years. She was completely lunable [unable] to remember items given to her after one or two minutes. There was no evidence of psychotic thinking or any severe alteration of mood. It seemed to me that she is not fully aware of her estate as to its amount, but does understand that the Colorado National Bank is the trustee. She did *403 fully understand that her son and grandson were beneficiaries to the estate and that she had recently delegated some financial responsibility to her son to administer her affairs. In my judgment she suffers from a chronic brain syndrome secondary to senility and definitely should have a guardian for her affairs. Dr. Hilton believed it would have been possible for decedent not to have been aware of what she signed on March 28, 1968, given her mental condition, although he felt that for being 89 years of age, she enjoyed "pretty good" mental capacity--about average for her age. He also felt that decedent looked very healthy for her age. He could not give an opinion, however, as to whether she believed at the time of the assignment that she had merely delegated authority to her son to administer her affairs or whether she had transferred the interest in her life estate to him. Colorado National Bank was appointed guardian of decedent on April 5, 1968. Also on that date, Colorado National Bank and Mr. Cavanaugh were appointed trustees "under the terms of that certain Trust Agreement dated June 29, 1933, as amended by instrument dated February 26, 1936 * * *"--in other words, under the *404 1933 trust. May C. Malone made gifts to John C. Malone or members of his family from at least 1961. Her gift tax returns showed the following gifts to John C. Malone or members of his family: Year
Nature of Gift
Amount
1961
Cash
$ 432.36
Home under construction
43,505.18
1962
Cash
4,898.17
Cash for home construction
completion costs
18,680.87
1963
Cash
6,763.82
Cash for home construction
completion costs
1,548.12
Cash for land adjoining home
3,000.00
1964
Cash - $250 per month
3,000.00
Miscellaneous cash gifts
5,941.92
1965
Cash - $250 per month
3,000.00
Miscellaneous cash gifts
1,661.84
Cash to John C. Malone's wife,
Geraldine D. Malone
3,015.00
Cash to John C. Malone as
custodian for his son,
Jerre D. Malone
3,010.00
1966
Cash - $250 per month
3,000.00
Miscellaneous cash gifts
1,550.00
1968
Life estate interest in 1933
Trust
57,330.89 For several years before decedent finally transferred her life estate interest in the 1933 trust to John C. Malone, he repeatedly made efforts to persuade her to do so. Mr. Cavanaugh also participated in some of these efforts. Mr. John P. Farnan, a long-time financial adviser to decedent, continually advised against such a transfer. Decedent relied entirely on Mr. Farnan to manage her financial *405 affairs. Mr. Farnan died on March 1, 1968, earlier in the month during which the assignment was finally made. In attempting to persuade his mother to transfer her life estate interest, John C. Malone at one time stated to his mother that such a transfer would cause her to have tax savings "in six figures." Mr. Farnan, in turn, told decedent that it was indeed true that she would have tax savings in six figures because she would not have an income. Mr. Farnan also assured decedent on several occasions that her fear of not having sufficient funds for her own support was groundless. Income tax returns of decedent for 1966, 1967 and 1968 showed the following: 1966
1967
1968
Total income
$48,715.04
$50,714.58
$34,450.09
Income from 1933 trust
21,131.20
22,103.95
6,093.60
Medical deduction
12,661.60
13,356.89
19,846.42
Trust and income expenses
540.00
920.00
10,266.31
Tax paid
10,300.00
12,419.76
34.46 Decedent's transfer of her trust income interest to John C. Malone resulted in a net income tax savings of $3,514.61 for 1968, computed as the difference between what May C. Malone would have paid in income tax on trust income and what John C. Malone actually did pay on that income. Decedent's assignment of her *406 income interest in the 1933 trust stated that her motive was to help provide for John C. Malone's family needs. John C. Malone spent many years in military service, first as an officer and later as an enlisted man because of a reduction in force in the Air Force. During those years he received tax-exempt income in the form of "quarters and subsistence pay." He also received income from the 1933 trust for the major part of his life. From 1967 through 1970, he and his wife also received income from various rental properties. On retirement from military service in 1970, his income increased over his income received as an enlisted man because of retirement credit received for earlier years as an officer. Decedent's nursing needs increased substantially in the latter part of 1968, resulting in substantially higher nursing costs and medical deductions for that year. The record does not show why decedent's trust and income expenses increased drastically in 1968. On January 10, 1969, May C. Malone died, at the age of 89, of a cold which developed into pneumonia; the cause of death listed on the death certificate was generalized arteriosclerosis. On September 2, 1969, Colorado National Bank, *407 as administrator C.T.A. of decedent's estate, and Mr. Cavanaugh filed a petition with the Denver, Colorado Probate Court for partial payment of their fees for decedent's estate. The petition stated, in part, as follows: [Inventory] of said probate estate on date of death contained securities of a fair market value approximating $700,000 * * * and * * * non-probate assets represented by a Trust created by decedent in 1927, in which she retained a life income interest and which has a fair market value exceeding $600,000 * * *. ULTIMATE FINDINGS OF FACT 1. Decedent was settlor of a trust created June 29, 1933. 2. Decedent was not mentally competent to assign her 1933 trust income interest on March 28, 1968. 3. Decedent's assignment of such interest was made in contemplation of death. OPINION The issue for decision is whether the fair market value of a trust created on June 29, 1933, is includable in decedent's gross estate. In resolving this issue, the following questions must be considered: (1) Whether decedent was settlor of the trust, under which she had a life income interest prior to her assignment of that interest in 1968; (2) Whether the 1927 predecessor of the 1933 trust was the *408 real instrument in issue, thus causing exclusion of the trust from decedent's gross estate under section 2036(b); [2]
(3) Whether a spendthrift clause invalidated decedent's 1968 assignment of her trust income interest under Colorado law; (4) Whether decedent was mentally competent to assign her trust income interest in 1968; and (5) Whether the 1968 assignment was made in contemplation of death within the meaning of section 2035. The first issue is thus whether decedent was settlor or creator of the trust dated June 29, 1933. If not, the trust corpus is admittedly not includable in her gross estate under section 2036(a), [3] *409 upon which respondent in part relies. The determination of who is settlor of a particular trust is a question of fact, to be based on all facts and circumstances attendant upon execution of the agreement. Estate of Arnold Resch,20 T.C. 171, 183 (1953); Estate of Grace D. Sinclaire,13 T.C. 742, 745-746 (1949); Estate of John H. Eckhardt,5 T.C. 673, 679-680 (1945). In this case, decedent had $25,000 to $30,000 in separate property when she married Richard H. Malone in 1910. This property was allowed to accumulate and was kept separate for decedent through 1926. Furthermore, Richard H. Malone transferred property to decedent for her own use and enjoyment during that period. The separateness of her property was evidenced by her own bank account, by stock issued in her own name, and by safekeeping accounts. As early as 1923, Colorado National Bank issued a receipt for securities valued at approximately *410 $125,000 in her own name. Decedent's net worth as of March 31, 1926, was thus over $300,000. Although much of that amount came from gifts made by Richard H. Malone, decedent stated unequivocally on several occasions during examination of Richard H. Malone's estate that there was no understanding that those gifts were to be placed in trust for his benefit in any way. Certainly there is no evidence that decedent did not fully own the property she placed in the 1927 trust. Cf. Helvering v. Talbott's Estate,116 F. 2d 160 (4th Cir. 1940), affg. 40 B.T.A. 1383 (1939). Furthermore, when the 1927 trust was revoked and replaced in 1933, the 1933 trust agreement stated that decedent was creator of the 1927 trust, that she desired to revoke that trust, and that she desired to create a new trust in place thereof. In addition, the following documents all refer to decedent as creator of the 1927 or 1933 trusts: (1) four 1927 trust amendments between 1927 and 1931; (2) the 1933 trust amendments of February 26, 1936; and (3) a petition for partial payment of fees with respect to decedent's estate filed by Colorado National Bank and Mr. Cavanaugh on September 2, 1969. Although Richard H. Malone *411 did have a domineering personality and his consent was required for investments or for trust amendments, we find on the record presented that decedent alone created the 1927 trust, revoked the 1927 trust in 1933, and created the 1933 trust, as amended in 1936, to replace the 1927 trust. Cf. First Nat'l Bank of Shreveport v. United States,342 F. 2d 415 (5th Cir. 1965); Estate of Dora N. Marshall,51 T.C. 696, 701-702 (1969); Estate of Grace D. Sinclaire,13 T.C. 742 (1949); Estate of Paul Loughridge,11 T.C. 968, 976-977 (1948), revd. on another issue 183 F. 2d 294, 299 (10th Cir. 1950), cert. denied 340 U.S. 830 (1950). Petitioner contends that an exception provided in section 2036(b)[4] for transfers made by trust before March 4, 1931, is applicable because the 1933 instrument should be regarded as merely amending the 1927 trust. The explicit, clear terms by which the 1933 trust revoked the 1927 trust, however, leave no doubt that the 1927 trust thus terminated in 1933 and that the 1933 trust, as amended in 1936, was substituted for the 1927 trust. Graphic support for this interpretation is provided by (1) decedent's 1968 assignment of her trust income interest, entitled "Release *412 and Assignment of Life Income Estate in May C. Malone Trust Dated June 29, 1933;" (2) the 1936 trust amendments, which amend a "trust agreement dated June 29, 1933" and omit any reference to the 1927 trust; (3) a substitution of trustees, dated April 5, 1968, based solely upon "that certain Trust Agreement dated June 29, 1933, as amended by instrument dated February 26, 1936"; and (4) the stamping of "CANCELLED" on the 1927 trust shortly after the 1933 trust was executed. Furthermore, the date of creation of an inter vivos trust is the date of execution of the trust instrument. Merchants Nat'l Bank of Mobile v. United States,156 F. Supp. 827, 830 (S.D. Ala. 1957), affd. 261 F. 2d 570, 575 (5th Cir. 1958). We accordingly reject petitioner's contention that the 1927 trust, rather than the 1933 trust, is the instrument in issue; section 2036(b) is thus inapplicable. [5] *413 The next issue is whether the 1933 trust's spendthrift clause invalidated decedent's 1968 assignment of her life estate. The 1933 trust required forfeiture of an interest by a beneficiary who attempted to assign it, but the 1936 trust amendments provided that no "anticipation, diminution, or *414 assignment" would be possible, and "during the lifetime of each of such beneficiaries, their said respective payments shall always be and be held to be created for the personal and individual use and benefit of such beneficiaries." The amended trust provision does constitute a spendthrift clause, and spendthrift trusts have been accepted as valid in Colorado. Snyder v. O'Conner,102 Colo. 567, 81 P. 2d 773, 774 (1938). See also In re Nicholson's Estate,104 Colo. 561, 93 P. 2d 880, 883-884 (1939); Newell v. Tubbs,103 Colo. 224, 84 P. 2d 820, 821 (1938); Hexter v. Clifford,5 Colo. 168 (1879); Griswold, Spendthrift Trusts 160 (1947). There is no Colorado law, however, as to the validity of a spendthrift clause where the trust beneficiary is also settlor of the trust. Case law in other jurisdictions is almost uniformly consistent in holding that a spendthrift clause will not invalidate an assignment by a trust beneficiary when that same individual was also creator of the trust, especially where creditors are involved, see 2 Scott, Trusts 1190 (3d ed.); Bogert, Trusts and Trustees, sec. 223, p. 665 (2d ed.); Griswold, Spendthrift Trusts 537, 572 (1947); 76 Am. Jur. 2d 404-405; 34 A.L.R. 2d 1342; *415 138 A.L.R. 1323, and dicta in one old Colorado decision, Hexter v. Clifford,5 Colo. 168, 171-172 (1879), would seem to support the same result on this point. We accordingly reject the contention that the trust's spendthrift clause invalidated decedent's assignment under Colorado law. The next issue is whether decedent was mentally competent under Colorado law to assign her trust income interest on March 28, 1968. Colorado cases characterize such capacity as a test for "sanity"; under them, there is always a presumption of such sanity. Hanks v. McNeil Coal Corp.,114 Colo. 578, 168 P. 2d 256, 260 (1946). The longstanding Colorado legal test on this point is whether the individual "was incapable of understanding and appreciating the extent and effect of business transactions in which he engaged." Hanks v. McNeil Coal Corp.,supra;Ellis v. Colorado Nat'l Bank of Denver,90 Colo. 489, 10 P. 2d 336, 340 (1932); Green v. Hulse,57 Colo. 238, 142 P. 416 (1914). We do not believe decedent was capable of understanding and appreciating the extent and effect of her assignment. Psychiatrist Robert J. Hilton examined decedent just two days after the assignment was made; his examination report *416 stated as follows: Mrs. Malone, as you know, is an 89 year old white widowed female who has been debilitated by old age for a number of years requiring a nursing home placement. The results of my interview indicate to me that Mrs. Malone is grossly disoriented to time and place. Her memory for both recent and remote events is quite faulty in that she cannot remember the name of her attending physician, nor the nurse that has cared for her for the past four years. She was completely lunable [unable] to remember items given to her after one or two minutes. There was no evidence of psychotic thinking or any severe alteration of mood. It seemed to me that she is not fully aware of her estate as to its amount, but does understand that the Colorado National Bank is the trustee. She did fully understand that her son and grandson were beneficiaries to the estate and that she had recently delegated some financial responsibility to her son to administer her affairs. In my judgment she suffers from a chronic brain syndrome secondary to senility and definitely should have a guardian for her affairs. With regard to the statement in that report that decedent understood "that she had recently delegated *417 some financial responsibility to her son to administer her affairs," Dr. Hilton could not opine at trial as to whether she believed at the time of the assignment that she had merely delegated authority to her son to administer her affairs or whether she had transferred her life estate to him. In his opinion, it would have been possible for decedent not to have been aware of what she signed on March 28, 1968. Furthermore, Aspen Siesta Nursing Home records show that decedent was "confused" on 171 out of 220 days for which such records were put into evidence. Comments from those records for days before the assignment include the following: "Usual confusion." "Very confused all day." "Nurse says she is more confused all the time." "Possibly losing sight in eye. Sees things that aren't there while not confused. Very noisy." "Lethargic somewhat. Singing most of eight hours. Speech slurring and very confused." "Very confused, restless & irritable." Comments for the period between the assignment and her death eight and one-half months later include: "Usual confusion." "Confused. Thinks she is in Illinois, etc., etc." "Called for Mamma. Did not sing until 2:00 p.m., but still confused." "Noisy, *418 irritable, confused, yelling 'Ma ma!'" In addition to the direct evidence set forth above bearing upon decedent's mental condition, the death of her trusted friend and financial adviser, John P. Farnan, earlier in that same month of March and the departure of her principal nurse for many years, Mrs. Gladys Stearns, from the nursing home in January may well have caused great stress in decedent. That decedent signed a "Petition for Appointment of Guardian" on the day of the assignment, even though that document asserted mental competence, casts further doubt on her capabilities at that time, as that document acknowledged her need for assistance in managing her affairs. We note also that decedent had previously expressed several times a fear of not having sufficient funds for her own support. It was inconsistent with such fears for decedent to have given away a life estate originating in securities worth almost as much as her separate net worth. Finally, Dr. Hilton expressly found that decedent was "not fully aware of her estate as to its amount." On the basis of all evidence presented, we believe decedent was not capable of understanding and appreciating the extent or the effect of *419 her purported assignment on March 28, 1968. That she knew her son, John C. Malone, would be receiving money as a result of her act on that date, as evidenced by questions put to decedent at that time by the nursing home administrator, and that her records at the nursing home on that date did not, for a change, indicate she was "confused" are insufficient to overcome the substantial evidence to the contrary set forth above. Since decedent's assignment was invalid due to her mental incapacity, the trust is includable in her estate under section 2036(a). Furthermore, petitioner has failed to overcome the statutory presumption that the assignment eight and one-half months before her death was made in contemplation of death within the meaning of section 2035, [6] *420 and the trust is accordingly also includable in the taxable estate under that section. In determining whether a transaction was made in contemplation of death, we must examine the "dominant, controlling or impelling motive" of decedent in making the transfer, Allen v. Trust Co. of Georgia,326 U.S. 630 (1946); Estate of James R. Lowe,64 T.C. 663, 672 (1975), based on all circumstances of the case. United States v. Wells,283 U.S. 102 (1931). Respondent's determination that the assignment was made by decedent in contemplation of death is entitled to the usual presumptive correctness and additionally to a rebuttable statutory presumption to that effect. Section 2035(b); Estate of Louis Zaiger,64 T.C. 927, 937 (1975). The phrase "in contemplation of death" is defined in section 20.2035-1(c), Estate Tax Regs., as follows: The phrase *421 "in contemplation of death", as used in this section, does not have reference to that general expectation of death such as all persons entertain. On the other hand, its meaning is not restricted to an apprehension that death is imminent or near. A transfer "in contemplation of death" is a disposition of property prompted by the thought of death (although it need not be solely so prompted). A transfer is prompted by the thought of death if (1) made with the purpose of avoiding death taxes, (2) made as a substitute for a testamentary disposition of the property, or (3) made for any other motive associated with death. The bodily and mental condition of the decedent and all other attendant facts and circumstances are to be scrutinized in order to determine whether or not such thought prompted the disposition. After considering the entire record, we find that petitioner has failed to show, contrary to the statutory presumption, that the assignment was not made in contemplation of death. Decedent's physical condition was not robust or good. Dr. Stephen Goodman, her physician at Swedish Hospital from 1961 to 1967, described her as "a very frail, fragile, elderly woman who had experienced *422 a stroke before I knew her. She was paralyzed on one side of her body. She was very weak and sick and frail and fragile." Records of Swedish Hospital and Aspen Siesta Nursing Home show decedent was subject to generalized arterosclerosis, senility 2degree, a history of glaucoma, mild dehydration, deterioration, and various minor ailments. She was unable to retain natural discharges and had to be fed her meals by her nurses. Respondent makes much of Dr. Stephen Goodman's suspicion that decedent may have had a malignant colon tumor. Decedent was never informed of this suspected tumor, and it had no ill effects on her life and did not lead to her death; we accordingly do not see its relevance in determining whether the dominant motivation for decedent's transfer was in contemplation of death. Furthermore, Dr. J. Frederic Prinzing, Jr., was aware of the possibility of cancer in decedent but found no evidence of cancer. Indeed, he felt that decedent would not have survived for seven years if she had had colon cancer and that the cancer would have manifested itself in other ways had it existed; in other words, there was no cancer demonstrable to him. Disregarding the suspected colon tumor, *423 decedent's physical health was thus still at best "average," as Dr. Prinzing described it. Mentally, comments recorded on Aspen Siesta Nursing Home records quote decedent as saying "May not be here in a.m.," "feels someone is trying to kill her" and "Thinks 'she is dying.'" These comments go right to the question in issue, and general testimony presented about decedent's cheerful nature pales by comparison. With regard to factors other than decedent's physical and mental condition, respondent emphasizes that Mr. Cavanaugh clearly had an intent to reduce estate taxes by having decedent make this assignment, as evidenced by his letter which stated that the assignment "would be to the advantage of her entire family as an estate plan for saving income and es-state taxes," and by an oral stipulation by counsel at trial that the life estate assignment was part of a family estate plan being planned by Mr. Cavanaugh. We cannot, however, equate Mr. Cavanaugh's motivation with decedent's motivation; the motives and mental processes of one particular human being, the decedent, have always been the sole inquiry of the courts in this regard. See, e.g., Estate of Oliver Johnson,10 T.C. 680, 688 (1948). *424 Much the same analysis is applicable with regard to a statement by John C. Malone that decedent could have tax savings in six figures. Such a statement shows that John C. Malone was concerned about saving taxes, but surely the same cannot be said about decedent from such a statement. We think such a statement does show, however, that, as far as is possible given her mental capacity at that time, decedent had undoubtedly been put on notice that large tax savings were possible, especially in view of repeated efforts by John C. Malone to have decedent make this assignment. And we think estate, rather than income, tax savings were clearly contemplated by John C. Malone in making this statement, as projected income tax savings at the time of assignment were small in comparison and would not reach "six figures" for almost ten years, based on decedent's 1966 and 1967 income tax returns. (Respondent's attempt to compare estate tax savings with income tax savings for 1968 is unfair. Decedent's expenses in 1968 had increased substantially, in part because her condition deteriorated sharply after the assignment was made, thus increasing substantially her medical deductions for that year.) Respondent *425 also makes much of the death of John P. Farnan, decedent's trusted financial adviser, earlier in the same month during which the assignment was made. He argues that Mr. Cavanaugh and John C. Malone finally had, in the death of Mr. Farnan, the removal of the last obstacle to their testamentary plan of having decedent make the assignment. We agree with this interpretation of the facts, but, again, it is the motivation of decedent that is significant. As to petitioner's contention that assignment of the life estate was part of a longstanding inter vivos gift-giving pattern from decedent to her son, the value of the life estate was far greater than decedent's earlier gifts. Excepting gifts of a home and of completion costs of that home in 1961 through 1963, decedent's gifts to John C. Malone or for his benefit from 1961 through 1966 averaged only $6,545.52, in contrast to the $57,330.39 value of the life estate in 1968. Furthermore, decedent made no gifts at all to John C. Malone in 1967. We thus cannot accept petitioner's contention on this point. Cf. Estate of Alvin Hill,64 T.C. 867, 878 (1975). Petitioner's contention that the assignment was motivated by John C. Malone's impending *426 retirement from military service is similarly unpersuasive. His financial situation was improved, not impaired, upon retirement, as his retirement pay was higher than his active duty pay in immediately preceding years. Furthermore, he received rental income from various properties from 1967 through 1970. Respondent has emphasized decedent's advanced age at the time of assignment. This was not shown to have been significant in decedent's motivation, and we do not find it persuasive in light of the other facts analyzed above. Cf. Estate of Maggie M. Holding,30 T.C. 988, 994-995 (1958). In sum, petitioner has not rebutted the statutory presumption that this assignment was made in contemplation of death within the meaning of section 2035. Decedent's health was not particularly good, she had contemplated imminent death at times, and her son had alerted her to potential tax savings. Her inter vivos gift-giving pattern and her son's retirement are not persuasive factors to the contrary. On the basis of all evidence presented, we conclude that the presumption in section 2035 has not been adequately rebutted. Respondent also contends that the assignment in issue falls squarely within the *427 reasoning of United States v. Allen,293 F. 2d 916, 918 (10th Cir. 1961), cert. denied 368 U.S. 944 (1961), in which the United States Court of Appeals for the Tenth Circuit held that the proportionate part of corpus of an irrevocable trust in which the settlor reserved three-fifths of the income for her life was includable in her gross estate even though she had sold her life interest for adequate consideration to a remainderman. The court reasoned that a different holding would permit tax avoidance because corpus could be removed from a taxable estate by sale of a life income beneficiary's interest at fair market value, thus opening a major means of tax avoidance contrary to the intent of the statute. Allen is distinguishable because no adequate consideration or sale was involved here. Petitioner has argued at length that the predecessors of section 2038, [7] especially section 302(d) of the Revenue Act of 1926, should have caused inclusion of the 1933 trust in Richard H. Malone's estate and that respondent is therefore precluded in some way from making his case now against decedent's estate. Section 2038 and its predecessors are irrelevant to this case, the Estate of Richard H. Malone *428 is not before us, and we find this argument to be without merit. We have examined the parties' other contentions and found them unconvincing. Because of a concession by petitioner with respect to another issue, Decision will be entered under Rule 155.
Footnotes
1. The "es-" and the line through "whether" and the initials thereunder were written in ink on this typed letter. No one in Dr. Prinzing's office made any of these additions.↩
2. Statutory references are to the Internal Revenue Code of 1954, unless otherwise indicated. ↩
3. SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE. (a) General Rule.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death-- (1) the possession or enjoyment of, or the right to the income from, the property, or (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.↩
4. SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE. * * *
(b) Limitation on Application of General Rule.--This section shall not apply to a transfer made before March 4, 1931 * * * ↩
5. We accordingly need not reach respondent's contention that section 2036(b) applies only to irrevocable trusts created before March 4, 1931. Compare Commissioner v. Estate of Talbott,403 F. 2d 851, 855 (4th Cir. 1968), revg. 48 T.C. 271 (1967), cert. denied 393 U.S. 1022 (1969); Smith v. United States,134 Ct. Cl. 136, 139 F. Supp. 305 (1956); Pope v. United States,296 F. Supp. 17, 23 (S.D. Cal. 1968); and Studebaker v. United States,195 F. Supp. 841, 850 (N.D. Ind. 1961), modified 211 F. Supp. 263, 270 (1962), with Estate of Newcomb Carlton,34 T.C. 988, 995 (1960), revd. on other grounds 298 F. 2d 415 (2d Cir. 1962); Estate of Ellie G. Canfield,34 T.C. 978, 986 (1960), affd. 306 F. 2d 1 (2d Cir. 1962); Estate of Ellis Branson Ridgway,33 T.C. 1000, 1003 (1960), affd. 291 F. 2d 257 (3d Cir. 1961); and Estate of Robert J. Cuddihy,32 T.C. 1171, 1174-1176 (1959). See also Savage v. United States,331 F. 2d 678, 680, fn. 1 (2d Cir. 1964), and Estate of James L. Thomson,58 T.C. 880, 889-890 (1972), affd. 495 F. 2d 246↩ (2d Cir. 1974).
6. SEC. 2035. TRANSACTIONS IN CONTEMPLATION OF DEATH. (a) General Rule.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, in contemplation of his death. (b) Application of General Rule.--If the decedent within a period of 3 years ending with the date of his death (except in case of a bona fide sale for an adequate and full consideration in money or money's worth) transferred an interest in property * * * such transfer * * * shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section * * *↩
7. Section 2038(a)(2), the relevant portion, provides as follows: SEC. 2038. REVOCABLE TRANSFERS. (a) In General.--The value of the gross estate shall include the value of all property-- * * *
(2) Transfers on or before June 22, 1936.--To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power, either by the decedent alone or in conjunction with any person, to alter, amend, or revoke, or where the decedent relinquished any such power in contemplation of his death. * * *↩